UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Alpine Glass, Inc.,

Plaintiff,

v.

Illinois Farmers Insurance Company and Mid-Century Insurance Company,

Defendants.

Civil No. 06-01148 PJS/RLE

**AFFIDAVIT OF CHARLES LLOYD IN SUPPORT OF MOTION TO DISMISS**

After swearing to tell the truth, Charles J. Lloyd states as follows:

1. I am an attorney for Plaintiff Alpine Glass, Inc., and I make this affidavit on personal knowledge.

2. Attached as Exhibit A is a true and correct copy of the form Farmers alleges to have created a pricing agreement between the parties of this lawsuit. (See First Am. Answer and Counterclaim p.8, ¶ 13.)

3. Attached as Exhibit B is a true and correct copy of Farmers' E1400 endorsement (no deductible) to its standard automobile insurance policy.

4. Attached as Exhibit C is a true and correct copy of Farmers' MN008 endorsement to its standard automobile insurance policy, applicable to those policyholders who have not purchased the additional coverage afforded by the E1400 policy.

5. Exhibit A is referenced in Farmers' First Amended Answer and Counterclaim as "prices provided to Plaintiff in written from prior to any job taking place." (First Am. Answer and Counterclaim at pp. 8-14, ¶¶ 13, 14, 35, 36, 37, 52.)

6. Exhibits B and C are referenced in Farmers' First Amended Answer and Counterclaim as "the Policies," but are not appended to the complaint. (See ¶¶ 3, 4, 5, 8, 9 10, 11, 12, 14, 15, 19, 21, 25, 26, 28, 35, 40, 42, 46, 47, 48, 50, 51, 52 (discussing the relevant insurance policies.)) Any analysis of the sufficiency of the complaint requires review of these documents.

7. Attached as Exhibit D is a true and correct copy of the unpublished decision of Brinkman's, Inc. v. Floe Int'l, C4-01-1117, 2002 Minn. App. LEXIS 335 (March 26, 2002).

8. Attached as Exhibit E is a true and correct copy of the unpublished decision of LIFE Rehab Servs., Inc., et al. v. Allied Prop. & Cas. Ins. Co., et al., 05-CV-1279 (JNE/FLN), 2006 U.S. Dist. LEXIS 3928 (Jan. 5, 2006).

9. Attached as Exhibit F is a true and correct copy of the unpublished decision of Roedler v. U.S. Dep't of Energy, Civil No. 98-1843 (DWF/AJB), 1999 U.S. Dist. LEXIS 21613 (D. Minn. Dec. 23, 1999).

10. Attached as Exhibit G is a true and correct copy of the unpublished decision of Smilde v. Richardson, et al., 97-568 (PAM/JGL), 1997 U.S. Dist. LEXIS 15050; 80 A.F.T.R.2d (RIA) 6813 (Aug. 27, 1997).

Dated: June 13, 2006.

Charles J. Lloyd

Subscribed to and sworn before me this 13th day of June, 2006.

Notary Public

TRACY ELIZABETH REITMANN
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2007

June 11, 2002

Dear Shop Owner/Manager:

As one of the administrators of the Farmers Insurance Glass Service, we wanted to inform you that Farmers Insurance has updated their pricing standards. To facilitate timely payment of invoices and avoid misunderstandings, please be sure to price all Farmers Insurance transactions in accordance with the prices indicated below. These prices are not the lowest available, however, they represent fair and reasonable prices for the market.

The pricing structure is as follows and is effective June 18, 2002:

| | | |
|---|---|---|
| Domestic & Foreign Windshield Discount | 59.00% | Off NAGs |
| Domestic & Foreign Tempered Discount | 59.00% | Off NAGs |
| Windshield Labor | $42.50 | Flat Labor |
| Tempered Labor | $42.50 | Flat Labor |
| High Modulus/Non-Conductive | $65.00 | 1.0 Kit |
| Urethane | $95.00 | 1.5 Kit |
| | $125.00 | 2.0 Kit |
| All other urethanes | $20.00 | per Kit |
| Repairs: | $50.00 | |
| | $10.00 | any additional repairs. Up to a maximum of 3 repairs. |

The prices listed above supercede any prior pricing agreements with Farmers Insurance Group.

Please continue to submit your invoices in accordance with the billing instructions on the fax/dispatch that you receive for each Farmers transaction. Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted.

We look forward to working with you in providing glass service to Farmers Insurance customers.

Rate A

**Exhibit A**

## SAFETY GLASS - WAIVER OF DEDUCTIBLE
## COVERAGE F

E1400
2nd Edition

For an additional premium, it is agreed that any deductible applying to Coverage F - Comprehensive does not apply to safety glass.

Our limit of liability for loss is the amount necessary to replace safety glass.

This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy.

91-1400 2ND EDITION 3-04 E1400201

# ENDORSEMENT AMENDING PART IV YOUR E-Z READER CAR POLICY, YOUR MOTORHOME PLUS POLICY AND YOUR E-Z READER MOTORCYCLE POLICY

MN008
MINNESOTA
1st Edition

When this endorsement is attached to your policy the following provisions apply:

Under **Limits of Liability**, item 1 (Item 1 and 2 for Motorcycle Policy) is deleted and replaced with the following:

1. The amount which it would cost to repair or replace damaged or stolen property with other of like kind and quality; or with new property less an adjustment for physical deterioration and/or depreciation.

   For glass losses, the maximum amount that we will pay for repair or replacement is the prevailing competitive price. Prevailing competitive price means prices charged by the majority of glass repairers in the local area as determined by a survey conducted by us. The competitive price includes the cost of repair or replacement including labor rates, parts and material. Upon your request, we will identify the facilities that will perform the repairs for the prevailing competitive price.

This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy.



Exhibit C

LEXSEE 2002 MINN. APP. LEXIS 335

**Brinkman's, Inc., Appellant, vs. Floe International, Inc., Respondent, Delano Sports Center, Inc., Respondent.**

**C4-01-1117**

**COURT OF APPEALS OF MINNESOTA**

*2002 Minn. App. LEXIS 335*

**March 26, 2002, Filed**

**NOTICE:** [*1] THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**PRIOR HISTORY:** Wright County District Court. File No. C5001230. Hon. Gary Meyer.

**DISPOSITION:** Affirmed.

**COUNSEL:** Craig D. Greenberg, Huffman, Usem, Saboe, Crawford & Greenberg, P.A., Minneapolis, MN (for appellant).

David S. Rochlin, Rochlin Law Firm, Ltd., Edina, MN (for respondent Floe Int'l).

Patrick J. Neaton, Neaton, Puklich & Klassen, Minnetonka, MN (for respondent Delano Sports).

**JUDGES:** Considered and decided by Crippen, Presiding Judge, Peterson, Judge, and Halbrooks, Judge.

**OPINIONBY:** HALBROOKS

**OPINION: UNPUBLISHED OPINION**

HALBROOKS, Judge

Appellant Brinkman's, Inc., challenges the district court's judgment of dismissal following its grant of summary judgment to respondent Floe International, Inc., and the dismissal of Brinkman's claim against respondent Delano Sports Center, Inc. Brinkman's argues that the district court erred in concluding that there was no franchise contract between itself and Floe, that **Minn. Stat. § 80E** (2000) is inapplicable, and that there are no genuine issues of material fact as to whether Floe and Delano had or intended to have a franchise [*2] agreement. Because we conclude that the district court did not err, we affirm.

FACTS

Appellant Brinkman's, Inc., is a retail trailer dealership that buys snowmobile trailers from respondent Floe International, Inc., a trailer manufacturer. Brinkman's and Floe began doing business with one another in 1996. On September 27, 1996, Wayne Floe, Floe's president, signed and sent Brinkman's a state-prepared form entitled "Minnesota Motor Vehicle Dealer License, Manufacturer's / Franchise Agreement" (the "certificate"). The certificate states:

Brinkman's, Inc. has an agreement with us at the present time for the sale * * * of new motor vehicles of our manufacture. This is a written agreement with Rory Brinkman as owner-president and will begin on 9-26-96 to continuous [sic] until cancelled.

Wayne Floe completed, signed, and sent a similar form to Brinkman's on March 20, 1997. Neither certificate was ever signed by Brinkman's. There were no other written agreements between the parties.

As part of their business relationship, Floe required Brinkman's to purchase a minimum number of trailers in its initial order. But, thereafter, Floe did not impose any purchase requirements [*3] on Brinkman's. Brinkman's never paid a franchise fee to Floe, but Floe listed Brinkman's as a "dealer" for its products and Brinkman's considered itself a franchised dealer. Wayne Floe described their arrangement by saying, "We'll deliver you trailers if you pay for them and if you do a good job for us we'll keep the relationship alive." Brinkman's concurred with this assessment, characterizing its responsibilities under the arrangement as to "order the product and pay for it."

In July 1997, Floe informed Brinkman's that it wanted to discontinue their relationship, but reconsidered after Brinkman's threatened legal action. A month later, Brinkman's sent Floe a letter to confirm that orders pre-

**Exhibit D**

viously placed by Brinkman's, Inc. will be filled in the ordinary course of business and Brinkman's, Inc. will continue to be a recognized dealer of Floe International, Inc.

In 1997, Delano started buying Floe's snowmobile trailers from other dealers and reselling them. Delano is located 7/10 of a mile from Brinkman's. Delano ordered directly from Floe in March 2000, but Delano's first order of trailers was mistakenly delivered to Brinkman's. As a result, Brinkman's learned that Floe and Delano [*4] were doing business together. Brinkman's sought an injunction and damages based on Floe's alleged violation of *Minn. Stat. § 80E.14* (2000).

Brinkman's alleged that it had a contract with Floe that Delano intentionally interfered with and that Floe violated *Minn. Stat. § 80E.14* by failing to give Brinkman's notice of its intention to make Delano a new dealer in the area. As an alternative theory, Brinkman's contended that Floe had misrepresented that Floe and Brinkman's had a contract.

Floe moved for summary judgment as to the claim brought under *Minn. Stat. § 80E.14* on the ground that Brinkman's was unable to prove that the parties had a contract that triggered section 80E or that Floe and Delano had a franchise agreement. For purposes of that motion, in an effort to obviate additional discovery, Floe stipulated that it was the industry standard to use the state certificate as a franchise agreement, that Floe and Brinkman's acted in a manner consistent with section 80E, and that they had a course of dealing that evinced their respective rights and liabilities. The district court denied Floe's motion, holding [*5] that there were genuine issues of material fact as to whether a valid contract, written or unwritten, existed between Brinkman's and Floe and concerning whether or not Floe had sought to enter into a franchise arrangement with Delano.

Following discovery, Floe brought a second summary-judgment motion, which the court granted. n1 The district court concluded that there was no contract between Floe and Brinkman's and no evidence to establish a contract between Floe and Delano. As a result, the court concluded that *Minn. Stat. § 80E.14* was inapplicable to Brinkman's claims and that there was no evidence to establish the elements of the claims of intentional interference or misrepresentation. This appeal follows.

n1 We note the district court appropriately disregarded the prior stipulations because they were in effect only for Floe's first summary-judgment motion. *See Lappinen v. Union Ore Co., 224 Minn. 395, 407-08, 29 N.W.2d 8, 17 (Minn. 1947)* (stating that a stipulation is binding on all involved only so long as it is in effect).

[*6]

## DECISION

Summary judgment is appropriate when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. On appeal from a dismissal following summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in applying the law. *Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995).* In doing so, we view the evidence in the light most favorable to the non-moving party by resolving all factual inferences and doubts against the moving party. *Funchess v. Cecil Newman Corp., 632 N.W.2d 666, 672 (Minn. 2001).* But summary judgment is appropriate when a party fails to make a sufficient showing on all of the requisite elements of its claim. *Iacona v. Schrupp, 521 N.W.2d 70, 72 (Minn. App. 1994).*

Brinkman's fundamental contention is that Floe violated *Minn. Stat. § 80E.14*, subd. 1 (2000), by contracting with Delano to sell snowmobile trailers without giving Brinkman's the required statutory notice. *Minn. Stat. § 80E.14*, subd. 1, states, in part:

In the [*7] event that a manufacturer seeks to enter into a franchise establishing an additional new motor vehicle dealership * * * within or into a relevant market area where the line make is then represented, the manufacturer shall, in writing, first notify each new motor vehicle dealer in this line make in the relevant market area of the intention to establish an additional dealership or to relocate an existing dealership within or into that market area. The relevant market area is a radius of ten miles around an existing dealership. Within 30 days of receiving the notice or within 30 days after the end of any appeal procedure provided by the manufacturer, the new motor vehicle dealership may commence a civil action in a court of competent jurisdiction pursuant to section 80E.17 challenging the establishing or relocating of the new motor vehicle dealership.

"Franchise" is defined in *Minn. Stat. § 80E.03*, subd. 8 (2000), as the written agreement or contract between any new motor vehicle manufacturer and any new motor vehicle dealer which grants to the dealer the right to market motor vehicles and which purports to fix the legal rights and liabilities of the parties [*8] to the agreement or contract.

The applicability of *Minn. Stat. § 80E.14*, subd. 1, is governed by *Minn. Stat. § 80E.02* (2000), which provides

that the section applies to "all * * * contracts existing between new motor vehicle dealers and manufacturers on May 1, 1981 and to all subsequent contracts." n2

n2 "Motor vehicle" includes trailers because *Minn. Stat. § 80E.03*, subd. 2 (2000), adopts the definition of *Minn. Stat. § 168.011*, subd. 4 (2000), which provides. "'Motor vehicle' means * * * any vehicle propelled or drawn by a self-propelled vehicle."

In order to prevail on its claim under section 80E.14, Brinkman's must establish that it had a contract with Floe for the sale of snowmobile trailers. A contract requires an offer, acceptance, and consideration. *Cohen v. Cowles Media Corp., 457 N.W.2d 199, 202 (Minn. 1990).*

The district court concluded there was no contract between Floe and Brinkman's [*9] because there was no evidence of any negotiation, offer and acceptance, consideration, or recitation of Brinkman's and Floe's rights and obligations in either the certificates, which were signed only by Floe and were unsolicited by Brinkman's, or in Brinkman's August 1997 letter to Floe. Brinkman's argues that there is a contract, or at least an issue of material fact regarding one, because the certificates explicitly state that the parties have an agreement and Floe's president testified in his deposition that there was an agreement to "deliver [Brinkman's] trailers if [they] pay for them and if [they] do a good job for us we'll keep the relationship alive."

Legal relationships arise from the law, not from the parties' labels. *See, e.g., Upper Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 241 (Minn. App. 1998)* (stating that franchise status is conferred by the law, not by the terminology used by parties in agreements). Thus, despite the characterization of the business relationship as an "agreement" for the sale of trailers, Floe and Brinkman's did not have an enforceable contract unless their agreement satisfies the law's requirements. In this case, we [*10] agree with the district court's conclusion that there was no enforceable contract between the two companies.

Consideration requires that the parties to a contract be mutually obligated to one another by either promising to act or to forbear from acting.

The factor that distinguishes an unenforceable promise from an enforceable contract is consideration, or the voluntary assumption of an obligation by one party upon condition of an act or forbearance by the other.

*Murray v. MINNCOR, 596 N.W.2d 702, 704 (Minn. App. 1999)* (quotation omitted), *review denied* (Minn. Sept. 28, 1999).

Brinkman's alleges that consideration is evidenced by the fact that Floe delivered the trailers that Brinkman's ordered and Brinkman's paid Floe for them. But a contract requires more than recurring conduct; it requires obligations. Brinkman's does not contend that it was obligated to Floe in any way other than to pay Floe for whatever trailers it purchased. Brinkman's never paid Floe for the certificate, any franchise fee, or for advertising. Indeed, beyond its initial order, Brinkman's had no obligation to purchase additional trailers from Floe.

Because there is no evidence [*11] in the record of consideration, the district court did not err in finding that there was no contract and, therefore, that *Minn. Stat. § 80E.14* is inapplicable. Given the absence of an enforceable contract between Floe and Brinkman's, it follows that the district court did not err in dismissing Brinkman's claim against Delano for interference with the alleged contract. *See Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994)* (stating that an element of intentional interference with a contractual relationship is the existence of a contract).

Brinkman's final argument is that the district court erred in granting summary judgment on the claim of intentional misrepresentation. To prove a claim of intentional misrepresentation, Brinkman's must show a representation relating to a past or present fact that (1) is false, (2) is material, (3) is susceptible of knowledge, (4) the representer either knows is false or asserts without knowing its truth or falsity, (5) the representer intends to induce the other person to act or they would be justified in acting upon it, (6) the person acts in reliance on the representation, and (7) the person suffers damage [*12] that is proximately caused by the misrepresentation. *S. Minn. Mun. Power Agency v. City of St. Peter, 433 N.W.2d 463, 469 (Minn. App. 1988).*

In this case, the alleged misrepresentation that the certificate was a contract is a representation of law, not fact. *Pieh v. Flitton, 170 Minn. 29, 30, 211 N.W. 964, 964 (1927)* (stating that a representation as to the legal effect of an instrument is a representation of law). Misrepresentations of law are not actionable unless (a) the party misrepresenting the law is knowledgeable in the field and took advantage of the other's solicited trust, or (b) the parties stand in a fiduciary relationship to one another or one of similar trust and confidence. *Nothernaire Prods., Inc. v. County of Crow Wing, 309 Minn. 386, 388-89, 244 N.W.2d 279, 281-82 (1976).* In addition,

[a] misrepresentation, though involving matter of law, will be held actionable if it amounts to an implied assertion that facts exist that justify the conclusion of law which is expressed.

*Miller v. Osterlund, 154 Minn. 495, 496, 191 N.W. 919, 919 (1923)* (citations omitted).

Nothing in this record indicates [*13] that Floe was more knowledgeable in the field than Brinkman's or that the parties had a fiduciary-like relationship. The record fails to contain support for other elements of the misrepresentation claim as well. Brinkman's did not make a sufficient showing on the elements of falsity and reliance. Floe's representation that there was an agreement was true insofar as Brinkman's was authorized to sell Floe's trailers. Brinkman's and Floe had the same understanding with respect to any ongoing obligation to purchase trailers. Finally, Brinkman's has made no showing that it was damaged by Floe's actions.

**Affirmed.**

LEXSEE 2006 U.S. DIST. LEXIS 3928

**LIFE Rehab Services, Inc., Medical Pain Management, Physicians' Diagnostics & Rehabilitation, Medical Advanced Pain Specialists, on behalf of themselves and all others similarly situated, Plaintiffs, v. Allied Property & Casualty Insurance Company, AMCO Insurance Company, Depositors Insurance Company, and Nationwide Insurance Company of America, Defendants.**

**Civil No. 05-CV-1279 (JNE/FLN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2006 U.S. Dist. LEXIS 3928*

**January 5, 2006, Decided**

**COUNSEL:** [*1] For LIFE Rehab Services, Inc., a Minnesota corporation, Medical Pain Management, a Minnesota corporation, Physicians' Diagnostics & Rehabilitation, a Minnesota corporation, Medical Advanced Pain Specialists, a Minnesota corporation, on behalf of themselves and all others similarly situated, Plaintiff: David B Ketroser, David B Ketroser, MD, JD, Hopkins, MN; John J Curi, Curi Law Office, Mpls, MN; Jordan M Lewis, Wood R Foster, Jr., Siegel Brill Greupner Duffy & Foster, PA, Philadelphia, PA; Neil P Thompson, Attorney at Law, Mpls, MN.

For Allied Property & Casualty Insurance Company, AMCO Insurance Company, Depositors Insurance Company, Nationwide Insurance Company of America, Defendant: Allen I Saeks, Monica L Davies, Leonard Street and Deinard, Mpls, MN; Edward K Cottrell, John P Marino, Fowler White Boggs Banker, Jacksonville, FL; Monica L Davies, Leonard Street and Deinard, PA, Mpls, MN.

**JUDGES:** JEANNE J. GRAHAM, United States Magistrate Judge.

**OPINIONBY:** JEANNE J. GRAHAM

**OPINION:**

**REPORT AND RECOMMENDATION**

THIS MATTER came before the undersigned United States Magistrate Judge on November 4, 2005, on Defendants' Motion to Dismiss Under *Rules 12(b)(6)* and *12(b)(7)* [# 8]. The [*2] matter was referred to the undersigned for Report and Recommendation pursuant to *28 U.S.C. § 636* and Local Rule 72.1. For the reasons that follow, this Court recommends Defendants' Motion be granted in part and denied in part.

**I. FINDINGS OF FACT**

Defendants Allied Property & Casualty Insurance Company ("Allied"), AMCO Insurance Company, Depositors Insurance Company, and Nationwide Insurance Company of America (referred to collectively by Plaintiffs as "Allied"), move to dismiss the claims against them. Plaintiffs LIFE Rehab Services, Inc. ("Life Rehab"), Medical Pain Management, Physicians' Diagnostics & Rehabilitation, and Medical Advanced Pain Specialists are all Minnesota corporations that provide medical services in the metropolitan area. Defendants insure the patients treated by the four Plaintiff corporations under Minnesota's No-Fault statutory scheme, *Minnesota Statute § 65B.001, et seq.* See Complaint PP 5-9. When patients are treated by Plaintiffs, they routinely sign "assignment of benefit" agreements before treatment, by which the patients assign to Plaintiffs the right to receive payments (or "benefits") for [*3] covered medical services from their insurance companies. See Complaint at P 9. The assignments permit Plaintiffs to seek payments for covered services directly from the insurance companies, instead of waiting for the insurance companies to pay the benefits to the patients, and then waiting for the patients to forward the payments to the medical providers.

Plaintiffs communicate the fact of the assignment to Allied through two forms, standard to the industry. Complaint P 13. Both forms contain a box that alerts the insurer that whatever benefits are due have been assigned by the patient to his medical provider. Complaint P 13. Plaintiffs allege that, despite the transmittal of the standardized forms that alerted Defendants to the patient assignment, Defendants routinely pay benefits directly to the patients. Complaint P 15. They allege that by ignoring the assignment, Defendants have damaged Plaintiffs by increasing the cost of collection, re-coordinating the

**Exhibit E**

order in which carriers are liable, and by not paying the required 15% interest. Complaint PP 16-19. Plaintiffs assert causes of action for (1) enforcement of statutory and common law rights; (2) breach of contract; (3) account [*4] stated; (4) declaratory relief; and (5) injunctive relief. See Complaint PP 35-52. n1

n1 Plaintiffs, in their Responsive Memorandum and at the motion hearing, voluntarily dismissed Count I (enforcement of statutory and common law rights), Count IV (declaratory relief), and Count V (injunctive relief). See Pl. Mem. p. 17. Accordingly, only Plaintiffs' Counts for breach of contract and account stated remain before the Court.

Defendants move to dismiss the Complaint as a matter of law, pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *12(b)(7)*. Defendants argue that Plaintiffs' claims should be dismissed because: 1) they are subject to mandatory arbitration under Minnesota law; 2) Plaintiffs rely on invalid assignments and lack standing to bring the claims asserted: 3) Plaintiffs have failed to add indispensable parties; and 4) because Plaintiffs have failed to state a claim upon which relief can be granted.

## II. LEGAL [*5] CONCLUSIONS

### A. Standard of Review

A cause of action should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of her claim that would entitle her to relief. *Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 740 (8th Cir. 2002)* (citations omitted). In analyzing the adequacy of a complaint under *Rule 12(b)(6)*, the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. See *Turner v. Holbrook, 278 F.3d 754, 757 (8th Cir. 2002)*. For the purpose of a motion to dismiss, facts in the complaint are assumed to be true. *In re Navarre Corp. Sec. Litig., 299 F.3d 735, 738 (8th Cir.2002)*.

Nevertheless, dismissal under *Rule 12(b)(6)* serves to eliminate actions that are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. *Neitzke v. Williams, 490 U.S. 319, 326-327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)*. To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and [*6] not merely legal conclusions. *Springdale Educ. Ass'n v. Springdale Sch. Dist., 133 F.3d 649, 651 (8th Cir.1998)*.

### B. Plaintiffs' Claims Are Not Subject to Mandatory Arbitration

Defendants argue that Plaintiffs' claims arise under Minnesota's No Fault Law and are therefore subject to the No Fault Law's mandatory arbitration provisions set forth in *Minnesota Statute section 65B.525*. According to Defendants, the arbitration provisions of *section 65B.525* apply to deprive this Court of subject matter jurisdiction to hear Plaintiffs' claims. *Section 65B.525*, subdivision 1 provides in part:

> The Supreme Court...shall by rules of court...provide for the mandatory submission to binding arbitration of all cases at issue where the claim at the commencement of arbitration is in an amount of $10,000 or less against any insured's reparation obligor for no-fault benefits or comprehensive or collision damage coverage.

The statute thereby deprives district courts of subject matter jurisdiction over insurance disputes involving claims for comprehensive benefits of $10,000 or less. *Illinois Farmers Ins. Co. v. Glass Serv. Co., Inc., 683 N.W.2d 792, 800 (Minn. 2004)*, [*7] citing *Olson v. Am. Family Mut. Ins. Co., 636 N.W.2d 598, 604 (Minn. App. 2001)* (noting that district court does not have jurisdiction over claims of "no-fault benefits"). The statutory obligation to arbitrate cannot be waived by the parties. Id. Neither can the amount in controversy of multiple claims against a particular insurer be aggregated to remove the claims from the scope of the mandatory arbitration provisions by exceeding the amount in controversy limit. *Id. at 804*. Therefore, where the amount in controversy for any individual claim is $10,000 or less, that claim is subject to mandatory arbitration. *Id. at 800*.

Here, Defendants argue that because the statute mandates arbitration in all cases where the claim is "$ 10,000 or less...for no-fault benefits...coverage." Plaintiffs' claims are subject to arbitration. Defendants, relying heavily on Illinois Farmers Ins. Co., reason that each of the seven patients identified by Plaintiffs quantifies the actual amount billed as less than $10,000, and that Plaintiffs' claims are therefore subject to mandatory arbitration because the amount in controversy (which cannot be aggregated) is less than $ [*8] 10,000. The Court disagrees. Though Plaintiffs' claims fall within the amount in controversy scope of the statute, the recovery they seek is not within the overall scope of *section 65B.525*.

In Illinois Farmers Ins. Co., a glass service company ("Glass Service") asserted that Farmers Insurance Company ("Farmers") underpaid it for over 5,700 instances of glass work that it performed for Farmers' insureds. The Minnesota Supreme Court determined that the No-Fault Act required Glass Service to arbitrate its

claims against *Farmers. 683 N.W. 2d at 804*. Glass Service had accepted payment from its customers in the form of assignments against Farmers. The court determined that Glass Service, as an assignee, took no greater or lesser rights than the individual policyholders had against Farmers, and that because the policyholders could not avoid arbitration by consolidating their claims with those of other policyholders, Glass Service could not either. *Id. at 803-04*, citing *Martin ex rel Hoff v. City of Rochester, 642 N.W.2d 1, 13 (Minn. 2002)* (an assignment operates to place the assignee in the shoes of the assignor, and provides the assignee [*9] with the same legal rights as the assignor had before assignment). The court reasoned that the aggregate of "operative facts" that gave rise to the claims against Farmers were the individual auto glass jobs that Glass Service performed for its policyholders; that the individual policyholders were the claimants; and that the policyholders' assignments of proceeds to Glass Service did not transform Glass Service' status as an assignee of multiple claims into a claimant with a single claim. *Id. at 804*. Therefore, the court held that Glass Service's claims were subject to mandatory arbitration. *Illinois Farmers Insurance Co.* is distinguishable from the instant case and does not control whether Plaintiffs must arbitrate their claims against Defendants. Though Plaintiffs and Glass Service share the same status as assignees, Plaintiffs' claims differ markedly from those of Glass Service. Glass Service had accepted payment in the form of assignments from the insureds. Farmers had honored the assignments and paid the insurance proceeds directly to Glass Service. Glass Service, however, argued that Farmers systematically underpaid the underlying claims. The determination of Glass Service's [*10] claims required the court to analyze each glass job performed on behalf of the insureds.

Here, Plaintiffs have not received the proceeds due under the insureds' purported assignments of proceeds. Rather, Defendants have allegedly ignored the assignments and paid the proceeds due directly to the insureds. Plaintiffs do not challenge the amount of moneys paid under the assignments. Plaintiffs' issue requires the Court to analyze only whether the assignments were valid and whether Defendants violated the assignments by paying the proceeds to the insureds. In the transactions at issue here, Allied has assumed its coverage obligations and paid the benefits due to the patients. The issue is not about whether benefits should be paid, or the amount of benefits paid, but to whom they should be paid. The statute, which limits the arbitration requirement to "all cases at issue...against any insured's reparation obligor for no-fault benefits...coverage," does not apply to deprive this Court of jurisdiction to hear Plaintiffs' claims.

Moreover, it appears to the Court that the judiciary is the proper arbiter of the questions of law presented — the validity of the alleged assignments and notification [*11] of assignments. In Minnesota, arbitrators of No-Fault claims are limited to deciding issues of fact, and the interpretation of laws is reserved to the courts. *AMCO Ins. Co. v. Ashwood-Ames, 534 N.W.2d 740, 741 (Minn. App. 1995)*; *Olson v. Auto-Owners Ins. Co., 659 N.W.2d 283, 286 (Minn. App. 2003)*. The interpretation and construction of the No-Fault statute and the insurance contracts are to be determined by the courts, and not an arbitrator. *AMCO, 534 N.W.2d at 741*.

Defendants argue that the application of law depends on the factual circumstances unique to each claim, and that the factual determinations must first be decided by an arbitrator. For instance, Defendants argue that an arbitrator must first determine the enforceability of each purported assignment, the breadth of each, and reimbursement issues, such as reasonableness of the expenses and the rights of other payers. See Def. Reply Mem. p. 5. The Court is not convinced that Plaintiffs' claims require the resolution of these issues, or that their resolution is solely within the purview of arbitration. As discussed above, the amount of proceeds is not in controversy, and [*12] the enforceability of the purported assignments is a question of law ripe for judicial review.

In sum, Plaintiffs' claims do not fall within the mandatory arbitration provision of Minnesota's No-Fault Act. Instead, Plaintiffs present questions of law which this Court is capable of deciding. The Court has subject matter jurisdiction over Plaintiffs' claims and Defendants' motion to dismiss should be denied.

**C. Plaintiffs Have Standing to Bring the Claims Asserted**

Defendants argue that Plaintiffs lack standing to bring their claims because no direct relationship exists between the Plaintiff medical providers and the Defendant insurance companies. See *Hardle v. Preston Energy, Inc., 374 N.W.2d 807 (Minn. App. 1985)* (parties had no privity of contract so defendants owed no duty to plaintiffs). It is true that Plaintiffs do not allege that a duty runs from Defendants to them under the governing policies or law. Instead, Plaintiffs allege that they have standing to bring their claims pursuant to the alleged assignments from Defendants' insureds.

Defendants claim that Plaintiffs lack standing because the anti-assignment provision in its insurance policy forbids [*13] the patient from assigning its policy right to Plaintiffs. The Court disagrees and finds that Defendants' alleged anti-assignment provisions do not preclude Plaintiffs' standing.

Generally, assignments are recognized under

Minnesota law subject to important limitations. *Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 270 (Minn. 2004)*. Assignments are not enforceable when a non-assignment clause applies. Id. Minnesota law treats the purported assignment of contractual rights as void when the underlying contract contains a non-assignment clause. *Id. at 274*. The Travertine Court held that such clauses need not contain "specific terms or magic words." Rather, there need be "merely some indication that the parties intended that the contract not be assigned." *Id. at 272*.

Accordingly, Defendants argue, the Court should treat the patients' alleged assignments of contractual rights as void because they are contravened by non-assignment clauses in the underlying insurance policies. See Def. Mem. p. 6. Neither Plaintiffs nor Defendants, however, have entered into record the insurance contracts at issue. Defendants argue nonetheless [*14] that "Plaintiffs' counsel...is well aware that the purported assignments through which they seek to gain standing...are rendered void by non-assignment clauses in each of the insurance contracts."

The Court finds Defendants' argument premature and outside the purview of a *Rule 12(b)(6)* motion to dismiss. A court should not grant a motion to dismiss for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of her claim that would entitle her to relief. *Schaller Tel. Co., 298 F.3d at 740* (citations omitted). In analyzing the adequacy of a complaint under *Rule 12(b)(6)*, the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. *Turner, 278 F.3d at 757* Here, Plaintiffs have asserted claims that Defendants have ignored and violated the assignments of contractual rights signed by their insureds. After further prosecution of the case, Plaintiffs may be able to convince the Court that the assignments are valid and that they effectively transfer the insured's rights as Plaintiffs allege. Whether the alleged assignments are barred [*15] by the purported anti-assignment provisions in the underlying insurance policy is not a question the Court need to determine on this *Rule 12* motion to dismiss. The policies and assignments at issue have not even been made part of the record. Whether any such anti-assignment provision prevents Plaintiffs from enforcing the assignment provisions or from recovering the relief they seek is a matter for trial, or at the very least upon a motion for summary judgment. At this early juncture, it appears to the Court that Plaintiffs may be able to prove the facts in support of their claims that would entitle them to relief, and Defendants' motion to dismiss in this regard should be denied.

**D. Plaintiffs Complaint Does Not Fail for Lack of Specificity**

Defendants argue that Plaintiffs' allegations fail to satisfy the minimal requirements of *Federal Rule of Civil Procedure 8*. Pursuant to *Rule 8*, Plaintiffs are required to provide Defendants with fair notice of the nature of their claims and the grounds upon which the claims rest. *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*.

As the Court has discussed, Plaintiffs have stated a claim [*16] that the Defendants ignored the assignments of their insureds. Defendants argue that Plaintiffs have not stated a claim for relief because they have not identified the insureds whose no-fault benefits are at issue, the insurance policies or contracts under which their purported claims arise, or the alleged separate assignments that they claim exist. See Def. Reply Mem. p. 17. Certainly such information is relevant to the case and discoverable. Plaintiffs Complaint does not fail, however, because such information was not included in the Complaint. The substance of Defendants' objections does not pertain to whether these claims as stated are recognized by law, as required by *Rule 12(b)(6)*, but rather whether these counts state a claim with sufficient detail, as required by *Rule 8*. The proper motion in such a case is not a motion to dismiss under *Rule 12(b)(6)*, but a motion for a more definite statement under *Rule 12(e)*. See *Radisson Hotels Int'l, Inc. v. Westin Hotel Co., 931 F.Supp. 638, 643 n. 5 (D.Minn. 1996)*. Accordingly, Defendants' motion to dismiss the Complaint for lack of specificity should be denied.

**E. Plaintiffs Have Not Failed to Add Indispensable [*17] Parties**

Defendants argue that the Complaint must be dismissed because Plaintiffs failed to join the patients/insureds as indispensable parties. *Federal Rule of Civil Procedure 19(a)(1)* provides that absent parties are necessary to a lawsuit when "complete relief cannot be accorded among those already parties." In determining whether a party is indispensable, a court should consider: (1) to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by shaping relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. *Fed. R. Civ. P. 19(b)*.

Defendants claim that if the action were to proceed in the absence of the insureds, it would be prejudicial to both Defendants and the insureds. They argue that Plaintiffs' claims arise from the underlying insureds' no-

fault benefits coverage, and that Plaintiffs [*18] claim that Defendants made, and continue to make, payment for medical treatments to the patients. Defendants argue that the benefits coverage belongs to the insureds, that the insureds' rights and obligations are clearly implicated, and that therefore all three parties, Defendants, Plaintiffs and insureds, are indispensable.

Defendants miss the crux of Plaintiffs' claims, which is the validity of the assignments. If the Court finds that the insureds' assignments to Plaintiffs are valid, Defendants will be liable and the rights and obligations of the patients will be unaffected. Likewise, a determination that the assignments are invalid would not affect the insureds' rights and obligations. The Court fails to see how a determination of validity or invalidity would prejudice the insureds. If Defendants want to sue or join the insureds, they may. See *Bergman v. Liverpool & London & Globe Ins. Co., 269 A.D. 103, 54 N.Y.S.2d 204 (NY Sup. Ct. App. Div. 1945)* ("If defendant claims that it is compelled at its peril to choose between the assignor and the assignee because of conflicting claims for the loss, it may protect itself by way of interpleader"). Plaintiffs, however, do not bear [*19] the burden of joining the insureds as indispensable parties to proceed with the litigation. Defendants' motion to dismiss for Plaintiffs failure to join indispensable parties should be denied.

**F. Account Stated**

Lastly, Defendants move to dismiss Plaintiffs' claim for account stated. An account stated claim requires an acknowledgment or an acquiescence of an existing condition of liability between two parties. See *Meagher v. Kavli, 251 Minn. 477, 88 N.W.2d 871 (Minn. 1958)*; *Spalla v. Navarre Corp., 2002 U.S. Dist. LEXIS 15948, 2002 WL 1949750, at *3 (D.Minn. Aug. 20, 2002)* ("An account stated is a stated sum which the debtor has agreed to be an accurate computation of the amount due to the creditor").

Here, Plaintiffs allege that Defendants have acknowledged or acquiesced to their liability to Plaintiffs because they were notified of their insureds' purported assignments. See Complaint PP 14-15. Plaintiffs' allegations miss the mark and fail to state a claim for account stated. As Defendants argue, it is clear that they have never acknowledged or acquiesced to an amount due Plaintiffs. Plaintiffs' claim for account stated should be dismissed.

**III. RECOMMENDATION**

Based on [*20] the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion to Dismiss [# 8] be **GRANTED in part and DENIED in part**, as follows:

> 1) Insofar as Defendants seek to dismiss Count III for Account Stated, the Motion should be **granted**;
>
> 2) In all other respects, the Motion should be **denied**.

DATED: January 5, 2006

JEANNE J. GRAHAM
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 25, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by *28 U.S.C. § 636* to review a transcript of the [*21] hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 25, 2006**, a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

LEXSEE 2002 MINN. APP. LEXIS 335

**Brinkman's, Inc., Appellant, vs. Floe International, Inc., Respondent, Delano Sports Center, Inc., Respondent.**

**C4-01-1117**

**COURT OF APPEALS OF MINNESOTA**

*2002 Minn. App. LEXIS 335*

**March 26, 2002, Filed**

**NOTICE:** [*1] THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**PRIOR HISTORY:** Wright County District Court. File No. C5001230. Hon. Gary Meyer.

**DISPOSITION:** Affirmed.

**COUNSEL:** Craig D. Greenberg, Huffman, Usem, Saboe, Crawford & Greenberg, P.A., Minneapolis, MN (for appellant).

David S. Rochlin, Rochlin Law Firm, Ltd., Edina, MN (for respondent Floe Int'l).

Patrick J. Neaton, Neaton, Puklich & Klassen, Minnetonka, MN (for respondent Delano Sports).

**JUDGES:** Considered and decided by Crippen, Presiding Judge, Peterson, Judge, and Halbrooks, Judge.

**OPINIONBY:** HALBROOKS

**OPINION:** **UNPUBLISHED OPINION**

HALBROOKS, Judge

Appellant Brinkman's, Inc., challenges the district court's judgment of dismissal following its grant of summary judgment to respondent Floe International, Inc., and the dismissal of Brinkman's claim against respondent Delano Sports Center, Inc. Brinkman's argues that the district court erred in concluding that there was no franchise contract between itself and Floe, that **Minn. Stat. § 80E** (2000) is inapplicable, and that there are no genuine issues of material fact as to whether Floe and Delano had or intended to have a franchise [*2] agreement. Because we conclude that the district court did not err, we affirm.

FACTS

Appellant Brinkman's, Inc., is a retail trailer dealership that buys snowmobile trailers from respondent Floe International, Inc., a trailer manufacturer. Brinkman's and Floe began doing business with one another in 1996. On September 27, 1996, Wayne Floe, Floe's president, signed and sent Brinkman's a state-prepared form entitled "Minnesota Motor Vehicle Dealer License, Manufacturer's/Franchise Agreement" (the "certificate"). The certificate states:

> Brinkman's, Inc. has an agreement with us at the present time for the sale * * * of new motor vehicles of our manufacture. This is a written agreement with Rory Brinkman as owner-president and will begin on 9-26-96 to continuous [sic] until cancelled.

Wayne Floe completed, signed, and sent a similar form to Brinkman's on March 20, 1997. Neither certificate was ever signed by Brinkman's. There were no other written agreements between the parties.

As part of their business relationship, Floe required Brinkman's to purchase a minimum number of trailers in its initial order. But, thereafter, Floe did not impose any purchase requirements [*3] on Brinkman's. Brinkman's never paid a franchise fee to Floe, but Floe listed Brinkman's as a "dealer" for its products and Brinkman's considered itself a franchised dealer. Wayne Floe described their arrangement by saying, "We'll deliver you trailers if you pay for them and if you do a good job for us we'll keep the relationship alive." Brinkman's concurred with this assessment, characterizing its responsibilities under the arrangement as to "order the product and pay for it."

In July 1997, Floe informed Brinkman's that it wanted to discontinue their relationship, but reconsidered after Brinkman's threatened legal action. A month later, Brinkman's sent Floe a letter to confirm that orders pre-

viously placed by Brinkman's, Inc. will be filled in the ordinary course of business and Brinkman's, Inc. will continue to be a recognized dealer of Floe International, Inc.

In 1997, Delano started buying Floe's snowmobile trailers from other dealers and reselling them. Delano is located 7/10 of a mile from Brinkman's. Delano ordered directly from Floe in March 2000, but Delano's first order of trailers was mistakenly delivered to Brinkman's. As a result, Brinkman's learned that Floe and Delano [*4] were doing business together. Brinkman's sought an injunction and damages based on Floe's alleged violation of *Minn. Stat. § 80E.14* (2000).

Brinkman's alleged that it had a contract with Floe that Delano intentionally interfered with and that Floe violated *Minn. Stat. § 80E.14* by failing to give Brinkman's notice of its intention to make Delano a new dealer in the area. As an alternative theory, Brinkman's contended that Floe had misrepresented that Floe and Brinkman's had a contract.

Floe moved for summary judgment as to the claim brought under *Minn. Stat. § 80E.14* on the ground that Brinkman's was unable to prove that the parties had a contract that triggered section 80E or that Floe and Delano had a franchise agreement. For purposes of that motion, in an effort to obviate additional discovery, Floe stipulated that it was the industry standard to use the state certificate as a franchise agreement, that Floe and Brinkman's acted in a manner consistent with section 80E, and that they had a course of dealing that evinced their respective rights and liabilities. The district court denied Floe's motion, holding [*5] that there were genuine issues of material fact as to whether a valid contract, written or unwritten, existed between Brinkman's and Floe and concerning whether or not Floe had sought to enter into a franchise arrangement with Delano.

Following discovery, Floe brought a second summary-judgment motion, which the court granted. n1 The district court concluded that there was no contract between Floe and Brinkman's and no evidence to establish a contract between Floe and Delano. As a result, the court concluded that *Minn. Stat. § 80E.14* was inapplicable to Brinkman's claims and that there was no evidence to establish the elements of the claims of intentional interference or misrepresentation. This appeal follows.

> n1 We note the district court appropriately disregarded the prior stipulations because they were in effect only for Floe's first summary-judgment motion. *See Lappinen v. Union Ore Co., 224 Minn. 395, 407-08, 29 N.W.2d 8, 17 (Minn. 1947)* (stating that a stipulation is binding on all involved only so long as it is in effect).

[*6]

## DECISION

Summary judgment is appropriate when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. On appeal from a dismissal following summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in applying the law. *Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995)*. In doing so, we view the evidence in the light most favorable to the non-moving party by resolving all factual inferences and doubts against the moving party. *Funchess v. Cecil Newman Corp., 632 N.W.2d 666, 672 (Minn. 2001)*. But summary judgment is appropriate when a party fails to make a sufficient showing on all of the requisite elements of its claim. *Iacona v. Schrupp, 521 N.W.2d 70, 72 (Minn. App. 1994)*.

Brinkman's fundamental contention is that Floe violated *Minn. Stat. § 80E.14*, subd. 1 (2000), by contracting with Delano to sell snowmobile trailers without giving Brinkman's the required statutory notice. *Minn. Stat. § 80E.14*, subd. 1, states, in part:

> In the [*7] event that a manufacturer seeks to enter into a franchise establishing an additional new motor vehicle dealership * * * within or into a relevant market area where the line make is then represented, the manufacturer shall, in writing, first notify each new motor vehicle dealer in this line make in the relevant market area of the intention to establish an additional dealership or to relocate an existing dealership within or into that market area. The relevant market area is a radius of ten miles around an existing dealership. Within 30 days of receiving the notice or within 30 days after the end of any appeal procedure provided by the manufacturer, the new motor vehicle dealership may commence a civil action in a court of competent jurisdiction pursuant to section 80E.17 challenging the establishing or relocating of the new motor vehicle dealership.

"Franchise" is defined in *Minn. Stat. § 80E.03*, subd. 8 (2000), as the written agreement or contract between any new motor vehicle manufacturer and any new motor vehicle dealer which grants to the dealer the right to market motor vehicles and which purports to fix the legal rights and liabilities of the parties [*8] to the agreement or contract.

The applicability of *Minn. Stat. § 80E.14*, subd. 1, is governed by *Minn. Stat. § 80E.02* (2000), which provides

that the section applies to "all * * * contracts existing between new motor vehicle dealers and manufacturers on May 1, 1981 and to all subsequent contracts." n2

n2 "Motor vehicle" includes trailers because *Minn. Stat. § 80E.03*, subd. 2 (2000), adopts the definition of *Minn. Stat. § 168.011*, subd. 4 (2000), which provides, "'Motor vehicle' means * * * any vehicle propelled or drawn by a self-propelled vehicle."

In order to prevail on its claim under section 80E.14, Brinkman's must establish that it had a contract with Floe for the sale of snowmobile trailers. A contract requires an offer, acceptance, and consideration. *Cohen v. Cowles Media Corp., 457 N.W.2d 199, 202 (Minn. 1990).*

The district court concluded there was no contract between Floe and Brinkman's [*9] because there was no evidence of any negotiation, offer and acceptance, consideration, or recitation of Brinkman's and Floe's rights and obligations in either the certificates, which were signed only by Floe and were unsolicited by Brinkman's, or in Brinkman's August 1997 letter to Floe. Brinkman's argues that there is a contract, or at least an issue of material fact regarding one, because the certificates explicitly state that the parties have an agreement and Floe's president testified in his deposition that there was an agreement to "deliver [Brinkman's] trailers if [they] pay for them and if [they] do a good job for us we'll keep the relationship alive."

Legal relationships arise from the law, not from the parties' labels. *See, e.g., Upper Midwest Sales Co. v. Ecolab, Inc., 577 N.W.2d 236, 241 (Minn. App. 1998)* (stating that franchise status is conferred by the law, not by the terminology used by parties in agreements). Thus, despite the characterization of the business relationship as an "agreement" for the sale of trailers, Floe and Brinkman's did not have an enforceable contract unless their agreement satisfies the law's requirements. In this case, we [*10] agree with the district court's conclusion that there was no enforceable contract between the two companies.

Consideration requires that the parties to a contract be mutually obligated to one another by either promising to act or to forbear from acting.

> The factor that distinguishes an unenforceable promise from an enforceable contract is consideration, or the voluntary assumption of an obligation by one party upon condition of an act or forbearance by the other.

*Murray v. MINNCOR, 596 N.W.2d 702, 704 (Minn. App. 1999)* (quotation omitted), *review denied* (Minn. Sept. 28, 1999).

Brinkman's alleges that consideration is evidenced by the fact that Floe delivered the trailers that Brinkman's ordered and Brinkman's paid Floe for them. But a contract requires more than recurring conduct: it requires obligations. Brinkman's does not contend that it was obligated to Floe in any way other than to pay Floe for whatever trailers it purchased. Brinkman's never paid Floe for the certificate, any franchise fee, or for advertising. Indeed, beyond its initial order, Brinkman's had no obligation to purchase additional trailers from Floe.

Because there is no evidence [*11] in the record of consideration, the district court did not err in finding that there was no contract and, therefore, that *Minn. Stat. § 80E.14* is inapplicable. Given the absence of an enforceable contract between Floe and Brinkman's, it follows that the district court did not err in dismissing Brinkman's claim against Delano for interference with the alleged contract. *See Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994)* (stating that an element of intentional interference with a contractual relationship is the existence of a contract).

Brinkman's final argument is that the district court erred in granting summary judgment on the claim of intentional misrepresentation. To prove a claim of intentional misrepresentation, Brinkman's must show a representation relating to a past or present fact that (1) is false, (2) is material, (3) is susceptible of knowledge, (4) the representer either knows is false or asserts without knowing its truth or falsity, (5) the representer intends to induce the other person to act or they would be justified in acting upon it, (6) the person acts in reliance on the representation, and (7) the person suffers damage [*12] that is proximately caused by the misrepresentation. *S. Minn. Mun. Power Agency v. City of St. Peter, 433 N.W.2d 463, 469 (Minn. App. 1988).*

In this case, the alleged misrepresentation that the certificate was a contract is a representation of law, not fact. *Pieh v. Flitton, 170 Minn. 29, 30, 211 N.W. 964, 964 (1927)* (stating that a representation as to the legal effect of an instrument is a representation of law). Misrepresentations of law are not actionable unless (a) the party misrepresenting the law is knowledgeable in the field and took advantage of the other's solicited trust, or (b) the parties stand in a fiduciary relationship to one another or one of similar trust and confidence. *Nothernaire Prods., Inc. v. County of Crow Wing, 309 Minn. 386, 388-89, 244 N.W.2d 279, 281-82 (1976).* In addition,

> [a] misrepresentation, though involving matter of law, will be held actionable if it amounts to an implied assertion that facts exist that justify the conclusion of law which is expressed.

*Miller v. Osterlund, 154 Minn. 495, 496, 191 N.W. 919, 919 (1923)* (citations omitted).

Nothing in this record indicates [*13] that Floe was more knowledgeable in the field than Brinkman's or that the parties had a fiduciary-like relationship. The record fails to contain support for other elements of the misrepresentation claim as well. Brinkman's did not make a sufficient showing on the elements of falsity and reliance. Floe's representation that there was an agreement was true insofar as Brinkman's was authorized to sell Floe's trailers. Brinkman's and Floe had the same understanding with respect to any ongoing obligation to purchase trailers. Finally, Brinkman's has made no showing that it was damaged by Floe's actions.

**Affirmed.**

LEXSEE 1999 U.S. DIST. LEXIS 21613

**Patrick Roedler; Thomas McDonough; Jeannie Strobel; Richard Palmer; Noreen Hoft; and HJ Company, Plaintiffs, v. United States Department of Energy; the Secretary of the Treasury of the United States; and the United States of America, Defendants, and Northern States Power Company, Nominal Defendant.**

**Civil No. 98-1843 (DWF/AJB)**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

*1999 U.S. Dist. LEXIS 21613*

**December 23, 1999, Decided**
**December 23, 1999, Filed**

**DISPOSITION:** [*1] Federal Defendants' Motion to Dismiss (Doc. No. 43) GRANTED. NSP's Motion to Dismiss, or in the Alternative, for Summary Judgment (Doc. No. 42) GRANTED. Plaintiffs' Complaint DISMISSED WITH PREJUDICE. Federal Defendants' Motion to Dismiss NSP's Crossclaim (Doc. No. 56) GRANTED. NSP's Crossclaim DISMISSED WITH PREJUDICE.

**COUNSEL:** John A. Cochrane, Esq., Cochrane & Bresnahan, St. Paul, Minnesota, for Plaintiffs.

Brian B. O'Neill, Esq., Elizabeth H. Schmiesing, Esq., Faegre & Benson, Rodney A. Wilson, Esq., Wilson Law Office, Minneapolis, Minnesota, for Plaintiffs.

Jack Kaufman, Esq., United States Department of Justice, Washington, D.C., for United States Department of Energy, the Secretary of the Treasury of the United States, and the United States of America, Defendants.

Timothy R. Thornton, Esq., Briggs & Morgan, Minneapolis, Minnesota, for Northern States Power Company, Nominal Defendant.

Julia E. Anderson, Assistant Attorney General, Minnesota Attorney General's Office, St. Paul, Minnesota, for Amici Minnesota Public Utilities Commission and Minnesota Department of Public Service.

**JUDGES:** DONOVAN W. FRANK, Judge of United States District Court.

**OPINIONBY:** DONOVAN W. FRANK

**OPINION:** [*2]

**MEMORANDUM OPINION AND ORDER**

**Introduction**

This case arises under the Nuclear Waste Policy Act ("NWPA"), *42 U.S.C.A. § 10101, et seq.* Specifically, the lawsuit focuses on a contract between Defendant United States Department of Energy ("DOE") and Nominal Defendant Northern States Power Company ("NSP"), under which DOE is obligated to dispose of NSP's spent nuclear fuel in exchange for fees paid by NSP to DOE. The Plaintiffs and putative class members are ratepayers of NSP who allege that they are entitled to damages and other equitable relief from DOE, the Secretary of the Treasury of the United States, and the United States of America (collectively, the "Federal Defendants") for DOE's breach of the contract.

The matter is currently before the Court on the Federal Defendants' Motion to Dismiss the Plaintiffs' Complaint and NSP's Motion to Dismiss the Plaintiffs' Complaint or for Summary Judgment. Due to the status of discovery, a motion for summary judgment is premature, and the motions to dismiss the Plaintiffs' Complaint will be treated as motions to dismiss. The matter is also before the Court pursuant to the Federal Defendants' Motion to Dismiss [*3] NSP's Crossclaim. NSP concedes that if the Plaintiffs' Complaint is dismissed, then NSP's Crossclaim is moot.

The Minnesota Public Utilities Commission ("MPUC") and the Minnesota Department of Public Service (collectively, the "State Agencies") filed a joint amici brief in support of the Defendants' motions to dismiss. The State Agencies request that the Court dismiss the Plaintiffs' lawsuit in deference to the MPUC's jurisdiction over the rates charged by NSP and in recognition of and deference to the ability of the State Agencies to protect ratepayers' interests.

**Exhibit F**

For the reasons stated below, the Court does not have subject matter jurisdiction over the present litigation, and the Plaintiffs otherwise fail to state a claim for which relief may be granted. Therefore, the Federal Defendants' and NSP's Motions to Dismiss are granted. NSP's Crossclaim is thus moot and is dismissed also.

Background

In 1982, Congress enacted the NWPA to protect the public health and the environment from the potential risks associated with radioactive waste. *42 U.S.C.A. § 10131*(a). The NWPA assigns to the federal government the responsibility to provide for the permanent [*4] disposal of spent nuclear fuel, and it directs that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." *42 U.S.C. § 10131*(a)(4). *Northern States Power Company v. United States, 43 Fed. Cl. 374, 376 (Fed. Cl. 1999).* The NWPA provides that the generators and owners of spent nuclear fuel have the responsibility to provide for and pay the costs of the interim storage of the spent nuclear fuel until the waste is accepted by DOE. *42 U.S.C.A. § 10131*(a)(5).

The NWPA authorized DOE to enter into contracts with owners and generators of spent nuclear fuel, pursuant to which DOE is to accept and dispose of the spent nuclear fuel in exchange for the payment of fees from the owners and generators. *42 U.S.C.A. § 10222*(a)(1). DOE regulations set forth a "Standard Contract" form to be used by DOE in entering into these contracts. *10 C.F.R. § 961.11*. Under the contracts, the owners and generators are to pay statutorily imposed fees to DOE, in return for which DOE would dispose of the spent nuclear fuel, "beginning not later than January 31, 1998." [*5] *42 U.S.C.A. § 10222*(a)(5)(b).

The NWPA also established the Nuclear Waste Fund ("NWF"), "composed of payments made by the generators and owners of such waste and spent fuel." *42 U.S.C.A. §§ 10131*(b)(4), 10222(c). The Secretary of the Treasury is the custodian of the NWF. *42 U.S.C.A. § 10222*(c). The NWPA specifies that expenditures may only be made from the NWF for administrative and operation purposes having a direct bearing upon radioactive waste disposal activities. *42 U.S.C.A. § 10222*(d). The Plaintiffs allege that DOE has earned interest on the funds in the NWF from their placement in interest-bearing accounts by the United States Treasury and that NSP's payments alone have earned over $90 million in interest through 1997. (Complaint at P 48.)

In June of 1983, DOE executed three virtually identical contracts with NSP (collectively, the "NSP Standard Contract") for the disposal of NSP's spent nuclear fuel, using the Standard Contract form set forth in *10 C.F.R. § 961.11*. (Complaint at P 12.) Article VIII of the NSP Standard Contract requires NSP, as "Purchaser," to pay DOE 1.0 [*6] mill per kWh of energy generated by nuclear means by the facility named in the contract. The 1.0 mill per kWh fee was statutorily mandated by the NWPA. *42 U.S.C.A. § 10222*(a)(2). NSP funds this fee through a line item charge on its ratepayers' monthly electricity bills. (Complaint at P 47.)

DOE failed to begin accepting the spent nuclear fuel by January 31, 1998, and as yet, has not begun accepting any spent nuclear fuel. (Complaint at P 40.)

DOE's breach has already been judicially determined in two cases brought under the NWPA. In 1995, DOE published a Notice in the Federal Register, setting forth its conclusion that it did not have an obligation to begin accepting spent nuclear fuel for disposal beginning January 31, 1998, absent the existence of a repository or interim storage facility by that date. *60 Fed. Reg. 21793* (May 3, 1995).

The United States Court of Appeals for the District of Columbia Circuit disagreed, holding that the NWPA created an unconditional obligation in DOE, reciprocal to the utilities' obligation to pay the fees into the NWF, to start disposing of the spent nuclear fuel no later than January 31, 1998. *Indiana Michigan Power Co. v. Dept of Energy, 319 U.S. App. D.C. 209, 88 F.3d 1272, 1276 (D.C. Cir. 1996).* [*7] The Court of Appeals held that a determination of the appropriate remedy was premature at that time, however, as DOE had not yet defaulted upon its statutory or contractual obligations. *Indiana Michigan, 88 F.3d at 1277.*

Following the Indiana Michigan decision, various state regulatory agencies and utilities, including NSP, petitioned the court for a writ of mandamus requiring DOE to begin disposing of the spent nuclear fuel by the statutory and contractual deadline of January 31, 1998. While the Court of Appeals reaffirmed that DOE had a clear duty to act and the petitioners had a clear right to relief, the Court of Appeals declined to issue the broad writ of mandamus sought because the petitioners had an adequate remedy under the Standard Contracts. *Northern States Power Co. v. United States Dept. of Energy, 327 U.S. App. D.C. 20, 128 F.3d 754, 759 (D.C. Cir. 1997).*

On June 6, 1998, prior to the Plaintiffs' filing of this lawsuit, NSP filed a complaint in the United States Court of Federal Claims against the United States, seeking monetary relief for the United States' breach of the NSP Standard Contract. *Northern States Power Co. v. United* [*8] *States, 43 Fed. Cl. 374 (Fed. Cl. 1999).* On April 6, 1999, the Court of Federal Claims granted the United States' motion to dismiss for failure to exhaust

the administrative remedies set forth in the NSP Standard Contract. *Northern States Power Co. v. United States, 43 Fed. Cl. 374, 388 (1999).*

On August 7, 1998, the Plaintiffs commenced the present litigation. The Plaintiffs and putative class members are utility customers, or ratepayers, of NSP. (Complaint at P 14.) The Plaintiffs' Complaint is set forth as follows: Count One, Breach of Contract; Count Two, Breach of Implied Contract; Count Three, Taking, Pursuant to the Tucker Act; Count Four, Unjust Enrichment; Count Five, Fifth Amendment Taking and Due Process; and Count Six, Declaration of NSP's Interest, seeking a declaration that NSP has no title to the funds it has collected from the Plaintiffs and an injunction against further collections.

The Plaintiffs do not allege any wrongdoing by NSP and seek no monetary relief against NSP, but rather have named NSP as a "Nominal Defendant."

**Discussion**

**A. Standard of Review**

In the present matter, the Federal Defendants have moved for dismissal, while NSP has moved for [*9] dismissal or, in the alternative, for summary judgment. The Plaintiffs argue that NSP's motion is properly considered as a motion for summary judgment, due to the parties' introduction of matters outside the pleadings. The Plaintiffs further argue that consideration of a summary judgment motion would be premature, due to the status of discovery.

The Court agrees that a motion for summary judgment is premature. However, the Court finds that the matter is capable of resolution as a motion to dismiss.

The Defendants move for dismissal pursuant to both *Fed. R. Civ. P. 12(b)(1)* and *Fed. R. Civ. P. 12(b)(6).*

Dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) will not be granted lightly. *Wheeler v. St. Louis Southwestern Ry. Co., 90 F.3d 327, 329 (8th Cir. 1996)*, citing *Bowe v. Northwest Airlines, Inc., 974 F.2d 101, 103 (8th Cir. 1992)*, cert. denied, *507 U.S. 992, 113 S. Ct. 1602, 123 L. Ed. 2d 164 (1993).* Dismissal is proper, however, where an attack on the complaint's alleged basis for subject matter jurisdiction reveals that there is no actual basis for jurisdiction. *Wheeler, 90 F.3d at 329*, [*10] citing *Bowe, 974 F.2d at 103.*

The district court has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1). *Osborn v. U.S., 918 F.2d 724, 728 n.4 (8th Cir. 1990)*, citing *Land v. Dollar, 330 U.S. 731, 735 & n.4, 67 S. Ct. 1009, 1011 & n.4, 91 L. Ed. 1209 (1947).* Consideration of matters outside the pleadings under such circumstances does not convert the proceedings to a Rule 56 summary judgment motion. *Osborn, 918 F.2d at 729.*

A complaint shall be dismissed for failure to state a claim under Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would demonstrate an entitlement to relief. *Springdale Educ. Assn. v. Springdale School Dist., 133 F.3d 649, 651 (8th Cir. 1998); Parnes v. Gateway 2000, Inc., 122 F.3d 539, 545 (8th Cir. 1997)*, citing *Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982).* Dismissal is proper only when the complaint on its face reveals "some insuperable bar to relief." *Duffy v. Landberg, 133 F.3d 1120, 1122 (8th Cir. 1998)*, [*11] quoting *Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).*

The allegations in the complaint must be treated as true and must be construed in the plaintiff's favor. *Duffy, 133 F.3d at 1122.* However, conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim. *Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998).*

In deciding a motion to dismiss under Rule 12(b)(6), the court may consider matters of public record. *Sebastain v. U.S., 185 F.3d 1368, 1374 (Fed. Cir. 1999).* In addition, the court may generally consider documents integral to the complaint and upon which the complaint relies, even when not attached to the complaint and produced instead by the defendant in support of a motion to dismiss. *Brogren v. Pohlad, 933 F. Supp. 793, 798 (D. Minn. 1995).* In the present matter, the NSP Standard Contract is referenced in the Complaint and is integral to and provides the basis of the Plaintiffs' claims. The Court may therefore consider the NSP Standard Contract and matters of public record without converting the present motions to dismiss into [*12] motions for summary judgment.

**B. Sovereign Immunity and Subject Matter Jurisdiction**

Under the doctrine of sovereign immunity, the United States is immune from suit unless it consents to be sued. *Miller v. Tony and Susan Alamo Foundation, 134 F.3d 910, 915*, (8th Cir. 1998). Waivers of the federal government's sovereign immunity must be unequivocally expressed in statutory text. *Miller, 134 F.3d at 915.* The United States' consent to be sued must be strictly construed in favor of the sovereign. *U.S. v. Nordic Village, Inc., 503 U.S. 30, 34, 112 S. Ct. 1011, 1014-15, 117 L. Ed. 2d 181 (1992).* In the absence of a waiver of sovereign immunity, the court lacks subject matter jurisdiction. *F.D.I.C. v. Meyer, 510 U.S. 471, 475, 114 S. Ct. 996, 1000, 127 L. Ed. 2d 308 (1994); Miller, 134 F.3d at 915-16.*

In the present matter, the Plaintiffs pursue their contract and taking claims, set forth in Counts One, Two, Three, and Five, under the Tucker Act, *28 U.S.C.A. § 1346*(a)(2). The Plaintiffs seek to pursue their due process claim under Section 702 of the Administrative Procedure [*13] Act, *5 U.S.C.A. § 702*. In addition, the Plaintiffs seek injunctive and declaratory relief, set forth in Count Six, under the Declaratory Judgment Act, *28 U.S.C.A. §§ 2201*-02, and the All Writs Act, *28 U.S.C.A. § 1651*. The Plaintiffs have conceded to dismissal of Count Four, Unjust Enrichment. (Pl. Mem. in Opp., p. 45, n.19.)

The Tucker Act provides that the district courts shall have jurisdiction over any "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." *28 U.S.C.A. § 1346*(a)(2). n1 In the present matter, the Plaintiffs seek monetary damages for breach of contract, breach of implied contract, and for unlawful taking under the Fifth Amendment.

> n1 As the Tucker Act waives sovereign immunity only for claims "against the United States," the Plaintiffs' claims under the Tucker Act may not proceed against DOE or the Secretary of the Treasury of the United States.

[*14]

**C. Count One: Breach of Contract**

The Tucker Act provides a basis for jurisdiction in the district courts for breach of contract claims under $10,000. *28 U.S.C.A. § 1346*(a)(2). *Ysasi v. Rivkind, 856 F.2d 1520, 1525 (Fed. Cir. 1988)*. The Tucker Act also extends its grant of jurisdiction to claims brought by plaintiffs who are not named parties to, but rather are intended third party beneficiaries of government contracts. *Carlow v. United States, 40 Fed. Cl. 773, 779 (Fed. Cl. 1998)*. In the present matter, the Plaintiffs claim that they are intended third party beneficiaries of the NSP Standard Contract.

**1. Third Party Beneficiaries**

The test for determining an intended third party beneficiary status is that the contract must reflect the express or implied intention of the parties to benefit the third party. *Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997)*. The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby. *Montana, 124 F.3d at 1273*. The test is premised [*15] upon the decision of the United States Supreme Court, which held that "before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit. *Carlow, 40 Fed. Cl. at 781*, quoting *German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230, 33 S. Ct. 32, 35, 57 L. Ed. 195 (1912)*.

When construing the intended benefit pursuant to a contract based on a federal statute, the court should look to the pertinent statutes and regulations and the underlying policy behind the contracts and applicable statutes and regulations. See *Busby School of Northern Cheyenne Tribe v. U.S., 8 Cl. Ct. 596, 602 (Cl. Ct. 1985)* ("the plaintiffs in question may very well be able to show they were intended third-party beneficiaries of the contracts between the School Board and the BIA given the pertinent statutes and regulations and the underlying policy behind the contracts and applicable statutes and regulations").

In the present matter, not only is the NSP Standard Contract itself lacking in any mention of ratepayers such [*16] as the Plaintiffs, but the statute and regulations in question are similarly devoid of any reference to ratepayers as an intended beneficiary. Instead, the NSP Standard Contract and the NWPA, with its accompanying regulations, refer only to intended obligations and benefits between DOE and the owners and generators of spent nuclear fuel, and to an intention to benefit and protect the general public welfare and the environment.

The NWPA contains an explicit statement of its purposes. *42 U.S.C.A. § 10131*(b). Included in its purposes is "a reasonable assurance that *the public and the environment* will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel . . . ." *42 U.S.C.A. § 10131*(b)(1) (emphasis added). The NWPA further specifies that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." *42 U.S.C.A. § 10131*(a)(4).

In accordance with its purposes, the NWPA authorized DOE "to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, [*17] " such as NSP. *42 U.S.C.A. § 10222*(a). The NWPA further authorized DOE to establish procedures for the collection and payment of fees from the generators and owners of the spent nuclear fuel. *42 U.S.C.A. § 10222*(a)(4). The NWPA does not authorize DOE to contract with ratepayers such as the Plaintiffs in any capacity.

The funds at issue in the present matter, contained in the NWF, are explicitly described in the NWPA as be-

ing "composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel." *42 U.S.C.A. §§ 10131*(b)(4). The NWPA specified that the fees and funds at issue are generated from utilities such as NSP, not from ratepayers such as the Plaintiffs.

In summary, the purpose of the NWPA is explicitly set forth as an intent to benefit and protect the public welfare and the environment. The NWPA and the corresponding regulations consistently and explicitly emphasize that the NWF fees will be paid [*18] by and the full costs of disposal will be borne by the owners and generators of the spent nuclear fuel. Ratepayers, such as the Plaintiffs, are not referenced in the statute or its accompanying regulations, either in regard to the benefits or the obligations contained in the NWPA.

Similarly, the NSP Standard Contract, entered into pursuant to the NWPA, is explicitly between DOE and NSP only; the ratepayers are not referenced, either in regards to the benefits or the obligations at issue. The preamble of the NSP Standard Contract reads as follows:

> Whereas, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors *in order to protect the public health and safety, and the environment*;
>
> . . .
>
> Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste;
>
> . . . .

(NSP Standard Contract, p. 1.)

The NSP Standard Contract sets forth, in Article VIII, that NSP, as "Purchaser," is required to pay [*19] DOE a fee of 1.0 mill per kWh on electricity. The NSP Standard Contract charges fees only to NSP and to no other person or entity. In exchange for payment of the fee, Article IV sets forth that DOE will accept title to NSP's spent nuclear fuel.

Finally Section XXII of the NSP Standard Contract contains an integration clause, which states that the contract "contains the entire agreements between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract."

Neither the NWPA nor the NSP Standard Contract reflects the express or implied intention to benefit the ratepayers as third parties. Rather, the statute and the contract explicitly contemplate that the parties' mutual obligations were entered into so as to benefit the general public as a whole.

The Plaintiffs cite to the legislative history in an attempt to create a question as to Congress' intent to benefit the ratepayers. However, where the resolution of a question of federal [*20] law turns on a statute and the intention of Congress, the court must first look to the statutory language. *Toibb v. Radloff, 501 U.S. 157, 162, 111 S. Ct. 2197, 2200, 115 L. Ed. 2d 145 (1991).* The court will then look to the legislative history if the statutory language is unclear; however, if the statutory language is not unclear, there is no need to look at the legislative history. *Toibb, 501 U.S. at 162, 111 S. Ct. at 2200.* The Court has looked to the explicit language of the NWPA and has found no such intention to benefit the ratepayers specifically. There is consequently no need to look at legislative history so as to create an ambiguity that does not otherwise exist.

Similarly, the Plaintiffs also cite to public statements by NSP in an attempt to create a question about the parties' intent to benefit ratepayers under the NSP Standard Contract. However, a court's interpretation of a contract begins with the contract's plain language. *McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (8th Cir. 1996).* If the provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may [*21] not resort to extrinsic evidence to interpret them. *McAbee, 97 F.3d at 1435.* Extrinsic evidence will not be received to change the terms of a contract that is clear on its face. *McAbee, 97 F.3d at 1435,* quoting *Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988).* The Court examined the language of the NSP Standard Contract and found no ambiguity that would require the introduction of extrinsic evidence. The Plaintiffs were not intended third party beneficiaries of the NSP Standard Contract.

As discussed above, the general rule for determining whether a plaintiff is an intended third party beneficiary is whether the contract reflects the express or implied intention of the parties to benefit the third party. *Montana, 124 F.3d at 1273.* However, under certain limited circumstances, the third party beneficiary test has a second prong. n2 *Schuerman v. U.S., 30 Fed. Cl. 420, 430 (Fed. Cl. 1994); Montana, 124 F.3d at 1273, n.6.* The second

prong of the third party beneficiary test applies in cases in which members of the public bring suit against promisors who contract [*22] with the government to render a public service or, in other words, in cases of general government contracts benefitting the public at large. *Schuerman, 30 Fed. Cl. at 430; Montana, 124 F.3d at 1273, n.6.* In such cases, the third party beneficiary test requires direct evidence in the contract that the contracting parties intended to give the third party an enforceable right to sue for compensation. *Schuerman, 30 Fed. Cl. at 430; Montana, 124 F.3d at 1273, n.6.*

> n2 The second prong was rejected as per se requirement of third party beneficiary status, and currently only applies under limited circumstances. *Carlow, 40 Fed. Cl. at 781; Schuerman, 30 Fed. Cl. at 430; Montana, 124 F.3d at 1273, n.6.*

In the present matter, the NSP Standard Contract is a government contract benefitting the public at large, as discussed above. Therefore, the second prong of the third party beneficiary test applies. The [*23] NSP Standard Contract must contain direct evidence that NSP and DOE intended to give the Plaintiff ratepayers an enforceable right to sue for compensation. There can be no question that the Plaintiffs fail to meet this test as a matter of law.

The Plaintiffs fail to meet either prong of the third party beneficiary test as a matter of law. Therefore, regardless of whether one or both prongs of the test are applied, the Plaintiffs are not third party beneficiaries of the NSP Standard Contract.

The Plaintiffs consequently fail to state a claim for breach of contract. In addition, because the Plaintiffs cannot sue under the NSP Standard Contract, there is no jurisdiction for breach of contract under the Tucker Act. Therefore, this Court does not have subject matter jurisdiction over the Plaintiffs' breach of contract claim and the claim must be dismissed.

**2. Exhaustion of Administrative Remedies**

In the alternative, the Plaintiffs' breach of contract claim must also be dismissed for failure to exhaust administrative remedies. The Plaintiffs allege that they are third party beneficiaries under the NSP Standard Contract. (Complaint at P 65.) The Court has already found that the [*24] Plaintiffs' allegation is erroneous as a matter of law. However, even if the Plaintiffs were third party beneficiaries under the Standard Contract, this Court would have to dismiss their claim of breach of contract for failure to exhaust administrative remedies.

A third party beneficiary is bound by the terms of the contract and is subject to the same defenses as the original party would be. *Robbins v. Prosser's Moving and Storage Co., 700 F.2d 433, 436 (8th Cir. 1983).* In the present matter, Article XVI of the NSP Standard Contract provides that "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer," whose decision shall be final and conclusive unless appealed to the DOE Board of Contract Appeals within 90 days. (NSP Standard Contract, p. 27; *10 C.F.R. § 961.11,* Article XVI.)

The Court of Federal Claims cited to this language in the NSP Standard Contract in dismissing NSP's lawsuit against the United States; the Court held that NSP was required to pursue its claims through the administrative remedies established in the NSP Standard Contract. *Northern States Power Co. v. United States, 43 Fed. Cl. at 382, 388.* [*25] As a third party beneficiary, the Plaintiffs would be subject to the same defense in this lawsuit. Therefore, even if the Plaintiffs' claim of third party beneficiaries status under the NSP Standard Contract was not erroneous as a matter of law, their breach of contract claim would still have to be dismissed for failure to exhaust administrative remedies.

**C. Count Two: Breach of Implied Contract**

In Count Two, the Plaintiffs allege that they are parties to an implied contract with DOE pursuant to the 1.0 mill per kWh fee paid into the NWF. (Complaint at P 67.) In their Response Brief, the Plaintiffs specified that their breach of implied contract claim is based upon an implied-in-fact contract theory, and they are not pursuing their claim based upon an implied-in-law contract theory. (Pl. Mem. in Opp., p. 45, n.19.) However, the Plaintiffs cannot set forth an entitlement to relief as a matter of law.

First, the existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract. *Atlas Corp. v. United States, 895 F.2d 745, 754 (Fed. Cir. 1990),* [*26] cert. denied, *498 U.S. 811, 111 S. Ct. 46, 112 L. Ed. 2d 22,* citing *ITT Fed. Support Services v. United States, 531 F.2d 522, 528, n.12, 209 Ct. Cl. 157 (1976).* In the present matter, the rights and duties in question, specifically, the payment of fees to DOE and DOE's corresponding obligation to accept spent nuclear fuel, are explicitly set forth in the NSP Standard Contract. Because the NSP Standard Contract already encompasses the subject matter of the Plaintiffs' claims, the Plaintiffs' breach of implied contract cause of action fails to state a claim as a matter of law.

In the alternative, the Plaintiffs cannot establish the elements of an implied contract as a matter of law. An implied-in-fact contract is one founded upon a meeting

of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. *Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995)*, quoting *Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597, 43 S. Ct. 425, 426-27, 67 L. Ed. 816 (1923)*. Like an express [*27] contract, an implied-in-fact contract requires: (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance. *Lewis, 70 F.3d at 600*, quoting *City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)*, cert. denied, *501 U.S. 1230, 111 S. Ct. 2851, 115 L. Ed. 2d 1019*. When the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract. *Lewis, 70 F.3d at 600*, quoting *City of El Centro, 922 F.2d at 820*.

In the present matter, the Plaintiffs have failed to allege mutuality of intent to contract and lack of ambiguity in offer and acceptance. Rather, the Plaintiffs' Complaint, including the NSP Standard Contract, and the NWPA establish that DOE and NSP contracted with each other for NSP's payment of fees to DOE in exchange for DOE's disposal of spent nuclear fuel.

In addition, the Plaintiffs cannot as a matter of law satisfy the fourth required element of an implied-in-fact, that of actual authority by the government representative [*28] in question. The NWPA authorized DOE to contract "with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, . . . ." *42 U.S.C.A. § 10222*(a)(1). DOE thus had actual authority to enter into contracts with utilities such as NSP. The Plaintiffs cannot as a matter of law establish that DOE had actual authority to contract with ratepayers such as the Plaintiffs for the disposal of spent nuclear fuel. The Plaintiffs' inability to establish actual authority to contract by DOE serves as an insuperable bar to relief in the present matter.

Count Two, breach of implied contract, thus fails to state a claim as a matter of law. Furthermore, without the existence of an implied contract, this Court lacks subject matter jurisdiction under the Tucker Act. Count Two must consequently be dismissed.

**D. Count Three and Count Five: Taking and Violation of Due Process**

In Count Three, the Plaintiffs assert that "DOE's actions constitute a taking without just compensation, and therefore compensation is available under the Tucker Act, . . . ." (Complaint, at P 69.) However, the Tucker Act is only a jurisdictional statute; it does not [*29] create any substantive rights. *Tippett v. United States, 185 F.3d 1250, 1254 (Fed. Cir. 1999)*, citing *United States v. Testan, 424 U.S. 392, 398, 96 S. Ct. 948, 953, 47 L. Ed. 2d 114 (1976)*.

In Count Five, the Plaintiffs' assert that "DOE's actions constitute a taking of plaintiffs' and putative class members' property without due process of law, . . . ." pursuant to the Fifth Amendment. (Complaint at P 73.) Therefore, the Court will assume that the Plaintiffs intend to assert both a due process and a taking claim under the Fifth Amendment.

**1. Taking under the Fifth Amendment**

Pursuant to a taking claim under the Fifth Amendment, a plaintiff must initially show standing. *Maniere v. United States, 31 Fed. Cl. 410, 420 (Fed. Cl. 1994)*. Standing is the constitutional requirement, imposed by the "cases or controversies" provision of Article III, that a plaintiff must allege a judicially cognizable and redressable injury in order to pursue a lawsuit. *Ben Oehrleins v. Hennepin County, 115 F.3d 1372, 1378 (8th Cir. 1997)*.

To establish standing pursuant to a taking claim, the plaintiff must show proof of personal [*30] injury, that is, the requisite interest in the property at issue and the deprivation thereof by the United States. *Maniere, 31 Fed. Cl. at 420*. Accordingly, to demonstrate the requisite interest in the property at issue, the plaintiff must demonstrate ownership of the property at the time of the taking. *Maniere, 31 Fed. Cl. at 420*. If the plaintiff fails to establish this most basic requirement of the personal injury component of the standing analysis, a court need not progress to the other considerations of standing. *Maniere, 31 Fed. Cl. at 420*.

The Plaintiffs cannot demonstrate ownership of the property at issue, which are the fees that NSP paid into the NWF, and thus have no standing to pursue a taking claim. The Plaintiffs concede that they simply paid their monthly electricity bills. Revenue paid by the customers for service belongs to the company. *Board of Public Utility v. New York Telephone Co., 271 U.S. 23, 31, 46 S. Ct. 363, 366, 70 L. Ed. 808 (1926)*. By paying bills for service, customers do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. [*31] *Board of Public Utility, 271 U.S. at 32, 46 S. Ct. 366*. The Plaintiffs in the present matter pay a fee for utility service, including the storage and disposal of spent nuclear fuel. The Plaintiffs thus do not retain an interest in the fee after it is paid to NSP. The Plaintiffs therefore lack standing to assert a taking claim. See also *Ben Oehrleins, 115 F.3d at 1379-81* (no standing for customers based upon paying the fees in question through passed-on costs).

The Plaintiffs respond in the present matter by arguing that the fees paid into the NWF are not merely passed

on to customers through increased utility bills, but rather, "the Plaintiffs here actually pay the fees in question to the United States, albeit *through the agency* of NSP. (Pl. Mem. in Opp., p. 25 (emphasis added).) The Plaintiffs thus argue that "NSP effectively acted as DOE's agent with respect to collection of the NWF fees." (Pl. Mem. in Opp., p. 51.) The Plaintiffs argue that "NSP had *apparent authority* to act as DOE's agent." (Pl. Mem. in Opp., p. 51 (emphasis added).)

However, "it is well established that the government is not bound by the acts of its agents beyond the [*32] scope of their *actual authority*." *Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1432 (Fed. Cir. 1998)* (emphasis added), citing *Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S. Ct. 1, 3, 92 L. Ed. 10 (1947)*. The Plaintiffs do not allege, and cannot as a matter of law establish, that NSP had actual authority to collect fees as DOE's agent.

Therefore, because the Plaintiffs cannot establish that they had the required ownership interest in the fees at the time that they were collected by DOE into the NWF, the Plaintiffs have no standing to pursue their takings claim.

In the alternative, even if the Plaintiffs had standing to pursue a taking claim based upon the NSP's payment of fees into the NWF, the Plaintiffs' taking claim would still be barred.

A compensable taking arises only if the government action in question is authorized. *Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1362 (Fed. Cir. 1998)*, citing *United States v. North Am. Transp. & Trading Co., 253 U.S. 330, 333, 40 S. Ct. 518, 64 L. Ed. 935 (1920)*. If the government action is unauthorized, the acts of [*33] the government's officers may be enjoinable, but they do not constitute the basis of a taking claim. *Del-Rio, 146 F.3d at 1362*. The principle underlying this rule is that when a government official engages in ultra vires conduct, the official will not, in any legal or constitutional sense, represent the United States, and what the official does or omits to do, without the *authority of Congress*, cannot create a claim against the government founded upon the Constitution. *Del-rio, 146 F.3d at 1362* (emphasis added), citing *Hooe v. United States, 218 U.S. 322, 31 S. Ct. 85, 54 L. Ed. 1055 (1910)*.

In the present matter, the NWPA authorized DOE to contract with NSP for the disposal of spent nuclear fuel in exchange for NSP's payment of fees. *42 U.S.C.A. § 10222*(a)(1). DOE had no such "authority of Congress" to take any such fees from the Plaintiffs. Therefore, in the absence of the required "authority of Congress," the DOE's collection of fees from the Plaintiffs would be ultra vires, and thus could not form the basis of a taking claim.

**2. Due Process**

In Count Five, the Plaintiffs allege that the assessment [*34] of fees violates due process under the Fifth Amendment. (Complaint at P 73.) However, the due process clause of the Constitution is not a money-mandating provision such as is required for jurisdiction to lie under the Tucker Act. *Golden Pacific Bancorp v. United States, 15 F.3d 1066, 1076 (Fed. Cir. 1994)*. The Plaintiffs concede that their due process claim is not cognizable under the Tucker Act. (Pl. Mem. in Opp., pp. 53-54.)

The Plaintiffs seek instead to pursue their due process claim under Section 702 of the Administrative Procedure Act ("APA"), *5 U.S.C.A. § 702*, which was not pled in their Complaint. The Plaintiffs thus move the Court to allow them to amend their Complaint accordingly.

However, the Plaintiffs' due process allegation otherwise fails to state a claim for relief. The due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action. *O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 789, 100 S. Ct. 2467, 2476, 65 L. Ed. 2d 506 (1980)*. The provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting [*35] from the exercise of lawful power. *O'Bannon, 447 U.S. at 789, 100 S. Ct. at 2476*. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals. *O'Bannon, 447 U.S. at 789, 100 S. Ct. at 2476*.

As the Court addressed earlier, the government did not directly appropriate any funds from the Plaintiffs, only from NSP. Any allegation by the Plaintiffs that DOE directly assessed fees against the Plaintiffs is erroneous as a matter of law. Therefore, the Plaintiffs' allegations fail to state a claim for violation of due process.

In addition, as the second element of a due process claim, after demonstrating that the plaintiff has a protected liberty or property interest at stake, the plaintiff must prove that the defendant deprived him or her of such an interest without due process of law. *Gordon v. Hansen, 168 F.3d 1109, 1114 (8th Cir. 1999)*. Due process requires adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Marler v. Missouri State Board of Optometry, 102 F.3d 1453, 1456 (8th Cir. 1996)*, quoting *Post v. Harper, 980 F.2d 491, 493 (8th Cir.1992)*. [*36] In the present matter, the Plaintiffs have not alleged that the government deprived them of notice or an opportunity to be heard. Thus the Plaintiffs have not set forth a claim that they were deprived of due process of law under the Fifth Amendment.

Finally, it is well established that a simple breach of contract does not rise to the level of a constitutional de-

privation. *Dover Elevator Co. v. Arkansas State Univ., 64 F.3d 442, 446 (8th Cir. 1995)* (due process claim under § 1983 and Fourteenth Amendment). In the present matter, the Plaintiffs' due process allegation is based upon DOE's breach of the NSP Standard Contract. The Plaintiffs have alleged no additional facts that would give rise to a due process claim. The Plaintiffs' allegation therefore does not state a claim for a violation of due process.

For the above reasons, the Plaintiffs' allegations are insufficient to set forth a claim either for taking or for violation of due process under the Fifth Amendment. Therefore, Count Three and Count Five must be dismissed as a matter of law. n3

> n3 The Plaintiffs' motion to amend the Complaint to plead their due process claim under the APA is consequently denied as moot and untimely.

[*37]

**3. Statute of Limitations**

In the alternative, even if the Plaintiffs' taking and due process allegations stated a claim for relief, the Plaintiffs' claims would still be barred by the statute of limitations.

The NWPA contains a statute of limitations as follows:

> A civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day after the date of the decision or action or failure to act involved, as the case may be, except that if a party shows that he did not know of the decision or action complained of (or of the failure to act), and that a reasonable person acting under the circumstances would not have known, such party may bring a civil action not later than the 180th day after the date such party acquired actual or constructive knowledge of such decision, action, or failure to act.

*42 U.S.C.A. § 10139*(c).

Subsection (a)(1), as referenced above, includes any civil action "challenging the constitutionality of any decision made, or action taken, under any provision of this part." *42 U.S.C.A. § 10139*(a)(1)(C). n4 In Count Three and Count Five, the Plaintiffs [*38] allege that DOE's collection of fees pursuant to the NWPA, *42 U.S.C.A. § 10222*(a), constitutes a taking and a violation of due process under the Fifth Amendment, in the context of DOE's failure to fulfill its corresponding obligation to begin accepting spent nuclear fuel by January 31, 1998.

> n4 The statute also provides that the United States courts of appeals shall have original and exclusive jurisdiction over any such action. *42 U.S.C.A. § 10139*(a)(1). The provision thereby provides an additional and distinct basis for the Court's conclusion that it lacks subject matter jurisdiction over the present matter.

Therefore, as the Plaintiffs seek to challenge the constitutionality of DOE's action taken under the NWPA, the Plaintiffs' claims are subject to the 180 day statute of limitations set forth above. DOE failed to fulfill its obligation to begin accepting spent nuclear fuel by January 31, 1998. (Complaint at P 40.) The Plaintiffs commenced the present action [*39] on August 7, 1998, thereby filing their action after the limitations period had run.

**E. Count Four: Unjust Enrichment**

A claim for unjust enrichment essentially states a claim for breach of an implied-in-law contract. *Nematollahi v. United States, 38 Fed. Cl. 224, 235 (Fed. Cl. 1997)*, citing *Trauma Serv. Group, Ltd. v. United States, 33 Fed. Cl. 426, 432 (Fed. Cl. 1995)*, aff'd, *104 F.3d 1321 (Fed. Cir. 1997)*. However, jurisdiction under the Tucker Act extends only to contracts either express or implied in fact, and not to claims on contracts implied in law. *Hercules, Inc. v. United States, 516 U.S. 417, 423, 116 S. Ct. 981, 985, 134 L. Ed. 2d 47 (1996)*, citing *Sutton v. United States, 256 U.S. 575, 581, 41 S. Ct. 563, 565-66, 65 L. Ed. 1099 (1921)*.

Therefore, the Court lacks subject matter jurisdiction over the Plaintiffs' claim of unjust enrichment, and Count Four must be dismissed. The Plaintiffs conceded that they are not pursing their claim of unjust enrichment. (Pl. Mem. in Opp., p. 45, n.19.)

**F. Count Six: Declaration of Utility's Interest**

In Count Six, the Plaintiffs seek a declaration [*40] that NSP has no title to the funds it has collected from the Plaintiffs and an injunction against further collections. (Complaint at P 75.) The Tucker Act, however, does not confer equity jurisdiction. *United States v. Woodall, 12 F.3d 791, 793 (8th Cir. 1993)*, citing *United States v. Testan, 424 U.S. 392, 397-98, 96 S. Ct. 948, 952-53, 47 L. Ed. 2d 114 (1976)*. The Plaintiffs concede that the Tucker Act does not waive sovereign immunity for their claims for equitable relief. (Pl. Mem. in Opp., pp. 67-68.) Instead, the Plaintiffs seek to proceed under the Declaratory Judgment Act, *28 U.S.C.A. § 2201*-2202, and the All Writs Act, *28 U.S.C.A. § 1651*, and seek to amend their Complaint to proceed under the APA, *5 U.S.C.A. §*

*702.*

First, to the extent that the Plaintiffs seek a declaration that NSP has no title to the funds it collects from the Plaintiffs, the Court has already found that the Plaintiffs' allegation is erroneous as a matter of law. As previously addressed, revenue paid by the customers for service belongs to the company, and by merely paying their utility bills, customers [*41] do not acquire any interest in the funds of the company. *Board of Public Utility, 271 U.S. at 32, 46 S. Ct. at 366.* When the Plaintiffs in the present matter pay their fees for utility service, including a fee for the storage and disposal of spent nuclear fuel, that fee then becomes the property of NSP, and the Plaintiffs no longer retain an interest in the fee after it is paid to NSP. To the extent that the Plaintiffs seek a declaration regarding title to funds in the NWF, on the other hand, the Plaintiffs have no standing to seek such a declaration and the Court has no jurisdiction over the subject matter, as previously discussed.

Secondly, to the extent that the Plaintiffs seek an "injunction against further collections," the Plaintiffs' claim must also be dismissed as a matter of law. There are two collections at issue in the present matter. First, NSP collects the fee from the Plaintiffs; second, DOE collects the fee from NSP.

To the extent that the Plaintiffs seek an injunction against the future collection of the fee in question by NSP, that claim may not proceed. As a preliminary matter, the Plaintiffs concede that they do not allege any wrongdoing by NSP [*42] and do not seek any recovery against NSP, but have merely named NSP as a Nominal Defendant. Nevertheless, to the extent that the Plaintiffs seek an injunction against NSP, the bar to that claim is discussed in further detail below.

In addition, the Plaintiffs cannot maintain an action for an injunction against the future assessment of fees by DOE, again, for reasons previously addressed in this Order. The Declaratory Judgment Act may allow individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained. *Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 71, n.15, 98 S. Ct. 2620, 2629, n.15, 57 L. Ed. 2d 595 (1978).* However, as previously addressed, the Plaintiffs cannot maintain this claim against DOE in the present matter. First, the Plaintiffs lack standing because, as previously discussed, DOE does not assess the fee in question against the Plaintiffs. DOE collects the fee in question from NSP only, pursuant to the NSP Standard Contract and the NWPA. Furthermore, as previously addressed in detail, the assessment of the fee in question [*43] does not constitute a taking under the Fifth Amendment.

Finally, the federal courts' power to exercise jurisdiction over declaratory judgment actions is discretionary. *Aetna Cas. and Sur. v. Jefferson Trust and Sav., 993 F.2d 1364, 1366 (8th Cir. 1993),* citing *State Farm Mut. Auto. Ins. Co. v. Bonwell, 248 F.2d 862, 865 (8th Cir. 1957).* The Declaratory Judgment Act was an authorization, not a command; it gave the federal courts competence to make a declaration of rights, but it did not impose a duty to do so. *Public Affairs Assoc., Inc. v. Rickover, 369 U.S. 111, 112, 82 S. Ct. 580, 582 7 L. Ed. 2d 604 (1962).*

A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest. *Rickover, 369 U.S. at 112, 82 S. Ct. at 582.* For the reasons stated above regarding the Court's jurisdiction, sovereign immunity, and the Plaintiffs' failure to otherwise state a claim, to the extent that the Court's power to exercise jurisdiction under the Declaratory Judgment Act is discretionary, the Court would otherwise decline to exercise jurisdiction [*44] in the present matter.

**G. Filed Rate Doctrine and Primary Jurisdiction**

In the alternative, to the extent that the Plaintiffs seek a refund or an injunction against the further collection of the fee in question by NSP, the Plaintiffs claims are barred by the filed rate doctrine and the doctrine of primary jurisdiction.

NSP is a "public utility," as defined in *Minn. Stat. § 216B.02*, subd. 4. Accordingly, NSP may only charge rates that have been approved by the MPUC, pursuant to *Minn. Stat. §§ 216B.03* and 216B.16. A "rate" is defined as "every compensation, charge, fare, toll, tariff, rental and classification, or any of them, demanded, observed, charged, or collected by an public utility for any service and any rules, practices, or contracts affecting any such compensation, charge, fare, toll rental, tariff, or classification." *Minn. Stat. § 216B.02*, subd. 5.

The filed rate doctrine "has its genesis in *Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251-252, 71 S. Ct. 692, 695, 95 L. Ed. 912 (1951).*" *Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 962, 106 S. Ct. 2349, 2354-55, 90 L. Ed. 2d 943 (1986).* [*45] In Montana-Dakota, the Supreme Court held that the plaintiff, who had argued that the utility's rates were fraudulent and unlawful, "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission. . . . ." *Montana-Dakota, 341 U.S. at 251, 71 S. Ct. at 695.* Ultimately, the Supreme Court held as follows:

> We hold that the right to a reasonable rate

> is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.

*Montana-Dakota, 341 U.S. at 251-52, 71 S. Ct. at 695.*

The Eighth Circuit applied the filed rate doctrine in 1992, in *H.J. Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485 (8th Cir. 1992).* In an action brought by customers against a telephone company, the Eighth Circuit affirmed the district court's dismissal, holding that the claims "necessarily and plainly challenge the rates previously approved by the Commission," and were thereby barred by the filed rate doctrine. *H.J. Inc, 954 F.2d at 493.* [*46]

The Plaintiffs claims are similarly barred in the present action. To the extent that the Plaintiffs seek a refund of any fee paid to NSP, and/or to the extent that the Plaintiffs seek an injunction against the further collection of any fee by NSP, the Plaintiffs claims are barred by the filed rate doctrine.

In the alternative, the primary jurisdiction doctrine will bar the Plaintiffs' claims. The primary jurisdiction doctrine is utilized to coordinate judicial and administrative decision making. *Access Telecommunications v. Southwestern Bell Telephone Co., 137 F.3d 605, 608 (8th Cir. 1998).* The doctrine comes into play whenever enforcement of the claim at issue requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. *Atlantis Express, Inc. v. Standard Transportation Services, Inc., 955 F.2d 529, 532 (8th Cir. 1992)*, citing *United States v. Western Pac. R.R., 352 U.S. 59, 63-64, 77 S. Ct. 161, 164-65, 1 L. Ed. 2d 126 (1956).* There exists no fixed formula for determining whether to apply the doctrine of primary jurisdiction. *Access Telecommunications, 137 F.3d at 608.* [*47] Rather, in each case the question is whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created. *Access Telecommunications, 137 F.3d at 608.* These reasons include promotion of uniformity in statutory and regulatory construction and utilization of the agency's specialized knowledge. *Atlantis Express, 955 F.2d at 532.* Additionally, application of the doctrine is appropriate when policy considerations are at issue. *Atlantis Express, 955 F.2d at 532-33.*

The purposes behind the doctrine of primary jurisdiction are evident in the present matter. The matter implicates the utilization of a statutory and regulatory scheme so as to fund the permanent disposal of spent nuclear fuel. Deference to the MPUC in such a matter is appropriate.

Notwithstanding the primary jurisdiction doctrine, however, for all the reasons stated, the present matter may not proceed before this Court.

**Conclusion**

This lawsuit and related litigation around the nation have arisen pursuant to an unfortunate reality. Spent nuclear fuel exists and, notwithstanding DOE's obligations under [*48] the NWPA, no permanent repository has been built. However, the present lawsuit is not the appropriate remedy for the ill. The present lawsuit ignores the fact that spent nuclear fuel has already been generated by NSP, and the funds that have been collected in the NWF are required to provide for permanent disposal.

NSP is currently responsible for the interim storage of the spent nuclear fuel; DOE remains responsible for its ultimate disposal. The Plaintiffs, however, have no such responsibility. If the putative class prevailed, the Plaintiffs would disgorge the NWF, but NSP and DOE would still be responsible for the spent nuclear fuel with no funds to provide for its disposal. A refund would therefore give rise to the need for future rate increases to finance the permanent disposal of the nuclear waste already produced, thus passing the cost on to future ratepayers.

Finally, the NSP Standard Contract pertains to the rights and obligations between NSP and DOE only. NSP pays its statutory fees into the NWF as a matter of law. The fact that NSP may fund this payment through a charge to the Plaintiffs' electricity bills neither affords this Court with jurisdiction over the present matter, [*49] nor entitles the Plaintiffs to the forms of relief they seek.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. The Federal Defendants' Motion to Dismiss (Doc. No. 43) is **GRANTED.**

2. NSP's Motion to Dismiss, or in the Alternative, for Summary Judgment (Doc. No. 42) is **GRANTED.**

3. The Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE.**

4. The Federal Defendants' Motion to Dismiss NSP's Crossclaim (Doc. No. 56) is **GRANTED.**

5. NSP's Crossclaim is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 23, 1999

DONOVAN W. FRANK

Judge of United States District Court

LEXSEE 1997 U.S. DIST. LEXIS 15050

**Peter V. Smilde, Plaintiff, v. Margaret M. Richardson, Commissioner, U.S. Internal Revenue Service; U.S. Department of the Treasury; and the United States of America, Defendants.**

**Civil File No. 97-568 (PAM/JGL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*1997 U.S. Dist. LEXIS 15050; 80 A.F.T.R.2d (RIA) 6813*

**August 27, 1997, Decided**
**August 28, 1997, Filed**

**DISPOSITION:** [*1] Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Clerk Doc. No. 12) GRANTED.

**COUNSEL:** PETER V SMILDE, plaintiff, Pro se, St Paul, MN.

For MARGARET M RICHARDSON, TREASURY, UNITED STATES DEPARTMENT OF THE, UNITED STATES OF AMERICA, defendants: Lawrence A Casper, US Dept of Justice, Washington, DC.

**JUDGES:** Paul A. Magnuson, United States District Court Judge.

**OPINIONBY:** Paul A. Magnuson

**OPINION:**

**MEMORANDUM AND ORDER**

This matter is before the Court upon Defendant Margaret M. Richardson, Defendant United States Department of the Treasury, and Defendant United States of America's (collectively "Defendants") Motion to Dismiss for Lack of Subject Matter Jurisdiction. For the following reasons, the Court grants Defendants' motion.

**BACKGROUND**

On March 11, 1997, Plaintiff Peter Smilde ("Smilde") filed the present action for a tax refund, alleging that Defendants incorrectly assessed a tax on unemployment compensation that he received in 1993. The Complaint further alleges that Defendants demanded that he pay interest and penalties based on his failure to pay the original tax assessed. Smilde claims that because his failure to pay the assessed tax was not due to willful neglect, no interest or penalty is proper. Additionally, Smilde claims that Defendants have misappropriated $4.3 billion of operating funds and that Defendants wish to contract out the processing of tax returns. Smilde [*2] requests that Defendants be ordered to repay the $4.3 billion to the United States Treasury, and that Defendants be enjoined from contracting out tax returns because such action would violate his and other taxpayers' privacy. Finally, Smilde asks that Defendants be enjoined from sending out duplicative and repetitive notices to taxpayers.

**DISCUSSION**

**A. Standard of Review**

For the purposes of the Defendants' Motion to Dismiss, the Court takes all facts alleged in Plaintiff's Complaint as true. See *Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990)*. Further, the Court must construe the allegations in the Complaint and reasonable inferences arising from the Complaint favorably to Plaintiff. See *Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986)*. A motion to dismiss will be granted only if "it appears beyond doubt that the Plaintiff can prove no set of facts which would entitle him to relief." Id.; see *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. Finally, the Court reads Plaintiff's pro se Complaint with "appropriate benevolence." *Thompson v. Missouri Bd. of Parole, 929 F.2d 396, 398 n.2 (8th Cir. 1991)* (citing [*3] *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)*). The Court applies these standards in the following discussion.

**B. Subject Matter Jurisdiction**

The federal courts are courts of limited jurisdiction, and these limits must not be disregarded. See *Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374, 57 L. Ed. 2d 274, 98 S. Ct. 2396 (1978)*. In the present case, Smilde's Complaint lists only two statutory bases for jurisdiction.

**Exhibit G**

The first is *28 U.S.C. § 2410*(a), which refers to property on which the United States has a mortgage or other lien. However, this statute only refers to the following types of actions: quiet title, foreclosure of a mortgage or lien, partitioning property, condemning property, or interpleader suits. Since none of these types of action are present in the instant lawsuit, no jurisdiction for Smilde's claim lies under section 2410(a).

Smilde also bases subject matter jurisdiction on *28 U.S.C. § 1331*. While a suit regarding a person's tax liability can be found to arise under the laws of the United States, Defendants assert that this suit cannot be brought because the United States has not waived its sovereign immunity. [*4] Any waiver of the United States' sovereign immunity must be explicitly stated in the statutory text and will not be implied. See *Lane v. Pena, 135 L. Ed. 2d 486, 116 S. Ct. 2092, 2096 (1996)*. Additionally, any ambiguities regarding waiver are construed in favor of immunity. See id. Section 1331 contains no explicit waiver of sovereign immunity. Therefore, this statute is not a valid basis for subject matter jurisdiction.

Although Smilde does not allege it, another possible basis for jurisdiction is *28 U.S.C. § 1346*(a)(1), which grants jurisdiction over civil actions for the recovery of taxes. Further jurisdictional prerequisites to this statute are listed in *26 U.S.C. § 7422*. This statute does provide the necessary statutory text indicating a waiver of sovereign immunity. *United States v. Michel, 282 U.S. 656, 658, 75 L. Ed. 598, 51 S. Ct. 284 (1931)*. However, Smilde has not met the procedural requirements of the statute. Section 7422(a) requires a plaintiff to first file a claim for a refund or credit with the Secretary of the Treasury. See *26 U.S.C. § 7422*(a); *Bruno v. United States, 547 F.2d 71, 74 (8th Cir. 1976)*. This administrative filing has been held [*5] to be a jurisdictional prerequisite to the filing of a tax refund suit. *Bruno, 547 F.2d at 74*. Smilde's Complaint indicates that he filed an application for a Taxpayer Assistance Order (Form 911). However, this form merely asked for a waiver and a cancellation of taxes due because of a claimed hardship by Smilde. Such application does not meet the requirements of an administrative filing as contemplated by the statute. Moreover, an additional requirement of section 1346(a)(1) is that the taxpayer fully pay any assessment before a refund suit may be maintained in district court. See *Flora v. United States, 362 U.S. 145, 177, 4 L. Ed. 2d 623, 80 S. Ct. 630 (1960)*. In this case, Smilde admits in his Complaint that Defendants still allege that he owes a balance of $71.71. Because Smilde has not made an administrative filing requesting a refund and because he has not paid the full tax assessed, section 1346(a)(1) cannot be used as a basis for subject matter jurisdiction.

In Smilde's Reply Brief to the Motion to Dismiss, he raises two additional theories of jurisdiction. First, Smilde states that his claim that the IRS return $4.2 billion to the U.S. Treasury is based on the Freedom [*6] of Information Act. *5 U.S.C. § 552* ("FOIA"). Second, he bases his request for an injunction against the IRS contracting out the processing of tax returns on the Privacy Act, *5 U.S.C. § 552a*. Both theories are inapposite.

First, as to the FOIA claim, the statute requires that a claimant exhaust administrative remedies before bringing suit. See *Brumley v. United States Dep't of Labor, 767 F.2d 444, 445 (8th Cir. 1985)* (per curiam). In his Complaint, Smilde never alleged that he made any request that Defendants return any funds to the U.S. Treasury. Accordingly, he has failed to exhaust his administrative remedies, and jurisdiction under the FOIA is improper.

Second, regarding the Privacy Act claim, it has been held that *section 6103 of the Internal Revenue Code* overrides the Privacy Act concerning matters of disclosure of tax return information. See *Cheek v. IRS, 703 F.2d 271, 271 (7th Cir. 1983)* (per curiam). Further, as Defendants point out, while the United States waived sovereign immunity in the Privacy Act, this waiver does not apply to the determination of the existence of liability for a tax. See *McMillen v. United States Dep't of Treasury, 960 F.2d 187, 188 (1st* [*7] *Cir. 1991)* (per curiam); see *26 U.S.C. § 7852*(e) ("The provisions of [the Privacy Act] shall not be applied, directly or indirectly, to the determination of the existence . . . of liability . . . of any person for any tax."). Thus, as the Government has not waived its immunity with respect to claims contesting tax liability, the Privacy Act does not support subject matter jurisdiction.

Finally, Defendants note that all of Smilde's claims which request that the Court enjoin Defendants are barred by the Anti-Injunction Act. See *26 U.S.C. § 7421*(a). Smilde's Complaint asks that the Court prevent Defendants from seizing any credits due Smilde, deny Defendants further operating funds, prevent Defendants from contracting out tax returns, and prevent Defendants from sending duplicative notices regarding taxes. The Anti-Injunction Act states that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." Id. This Act bars the above claims by Smilde as they are all requests for injunctive relief relating to the assessment of taxes.

## CONCLUSION

In sum, Smilde has failed to assert any claim over [*8] which this Court has subject matter jurisdiction. Because this Court lacks subject matter jurisdiction, the Court grants Defendants' Motion to Dismiss.

Accordingly, IT IS HEREBY ORDERED THAT:

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Clerk Doc. No. 12) is GRANTED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 27, 1997

Paul A. Magnuson

United States District Court Judge