IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

ALPINE GLASS, INC.,

Plaintiff/Counterclaim Defendant,

vs.

ILLINOIS FARMERS INSURANCE COMPANY AND MID-CENTURY INSURANCE COMPANY,

Defendants/Counterclaim Plaintiffs.

Court File No. 0:06-CV-01148 PJS-RLE

**DECLARATION OF MICHAEL KELLER**

I, Michael Keller, declare as follows:

1. I make this Declaration upon personal knowledge and based upon information and belief.

2. I am employed by Farmers Insurance Exchange, a California interinsurance exchange. Since the middle of 2003, my position with Farmers Insurance Exchange has been National Claims Manager for automobile glass claims. As such, I oversee the automobile glass claims program in Minnesota and in other states, including but not limited to, the Farmers FASGLAS program in those states. My responsibilities include oversight of such claims in Minnesota involving Illinois Farmers and Mid-Century Insurance Company ("Farmers").

3. From early 1999 to the middle of 2003, I was a home office director and worked on the CRN project. CRN, short for the Customer Restoration Network, is a claims processing system that Farmers uses for retrieving and processing customer information when a customer calls in a claim. I was also involved in setting up the

Farmers Vendor Management Department. As such, I was involved in the auto glass claims handling process.

4. Around 1995, Farmers hired Safelite Solutions, LLC ("Safelite") to administer Farmers' automobile glass repair and replacement claims. Safelite is a third party administrator that assists Farmers in the process of handling glass claims through maintenance of a network of affiliate glass shops, and the processing and payment of invoices from auto glass shops.

5. Safelite provides nationwide coverage for auto glass claims, ensuring that Farmers' policyholders in any location across the United States can obtain readily available auto glass replacement services. Safelite maintains a network of affiliate glass shops that have contracted with Safelite to do repair and replacement work for Safelite's insurance company clients at set prices.

6. Safelite does not work solely with Safelite affiliate auto glass vendors. When processing Farmers' claims, Safelite also dispatches work to non-affiliate vendors like Alpine Glass, Inc. ("Alpine") when the Farmers insured requests the non-affiliate shop. In Minnesota, Safelite and Farmers must respect the insured's choice of glass shop, and pay the chosen glass shop directly. Farmers provides Safelite with telephone scripts for its customer service representatives (CSR) that explain to the Farmers insureds that Farmers respects any choice of glass shop. As directed by the Minnesota Unfair Claims Practices Act (UCPA), when a Farmers' policyholder from Minnesota calls, the Safelite CSR explains: "Minnesota law gives you the right to go to any glass vendor you choose, and prohibits me from pressuring you to choose a particular vendor."

7. The amounts Farmers intended to pay (and did pay) according to its insurance policies and Minnesota law were sent to various glass shops in Minnesota and elsewhere in faxed pricing bulletins (“Blast Fax(es)”) whenever Farmers made changes to its pricing from June 2002 on. On behalf of Farmers, Safelite handled the actual communication of the Blast Faxes. Farmers gave full authorization to Safelite to send the Blast Faxes to glass shops, and approved their contents.

8. Alpine has never contracted with Safelite or Farmers to be an affiliate provider glass shop for Farmers, but Safelite frequently deals with Alpine when a Farmers insured specifically requests Alpine.

9. All known open Minnesota Alpine stores, or Alpine’s corporate office, were included as recipients of the Blast Fax pricing bulletins.

10. The Blast Faxes listed the “pricing standards” that Farmers would pay for the following parts and labor: Windshield Discount (in terms of a discount off of or above National Auto Glass Specifications (“NAGS”) benchmark pricing); Tempered Discount (in terms of a discount off of or above NAGS); Labor; High Modulus/Non-Conductive Urethane; All other Urethane; and Repairs.

11. The Blast Faxes stated, “Please continue to submit your invoices in accordance with the billing instructions on the fax/dispatch that you receive for each Farmers transaction. Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted.” The Blast Faxes also stated, “We look forward to working with you in providing glass service to Farmers Insurance customers.”

12. Beginning in February of 2005, the Blast Faxes included the following language:

> Our policyholders have the right of personal choice and preference in their selection of an automotive glass shop. However, because we are obligated, on behalf of all of our policyholders, to pay only the fair market value for glass repairs and replacement services, you may consider refusing the job if you are unwilling to provide service at the prices Farmers Insurance has offered above. Nothing contained in any oral or written notice received by us or our agent from you purporting to reject such pricing for services you may render for any of our insureds will be binding on us or otherwise require us to pay you additional sums for services rendered.
>
> If you desire to bill for more than Farmers Insurance's fair and reasonable pricing as stated above, you must advise our policyholders prior to initiating glass repair/replacement so that they can determine whether they are willing to pay the additional costs for your services.

13. The Blast Faxes stated on their face that the prices listed within were to supersede any prior pricing agreements the glass shop had with Farmers.

14. Safelite customer service representatives confirmed by telephone Farmers' pricing terms with an Alpine representative, if available. Typically, these telephone conferences were initiated by the insured, or both the insured and an Alpine representative. During this call the Safelite CSR would tell the policyholder and the Alpine representative the prices that had been offered by Farmers in the Farmers Blast Fax. Farmers monitored the calls between Safelite CSRs and the insureds and glass shop representatives to ensure that the CSRs followed the Farmers' scripts. The telephone calls were recorded by Safelite and available to Farmers for compliance purposes.

15. Safelite also reconfirmed Farmers' pricing terms by transmitting a faxed dispatch/work order document to Alpine with Farmers' itemized pricing for the specific

claim ("Fax Dispatch"). The Fax Dispatch prices for the specific claims derived from the Blast Fax prices and did not deviate from those prices. Farmers gave full authorization to Safelite to send the Fax Dispatches to glass shops, and Farmers approved their contents.

16. Starting in 2003, and continuing to the present, every Fax Dispatch that went to Alpine included a confirmation of the pricing terms and stated below that pricing notice: "Performance of services constitutes acceptance of the above price." This language was spelled out in capital letters in 2003, and lowercase letters from 2004 through 2007.

17. Farmers' glass claim payment system was set up so that when the insured called in a claim, the Fax Dispatch was sent to the glass shop prior to the work ever starting. In some cases, Alpine would verify coverage with Farmers or Safelite prior to beginning work. Unfortunately, Alpine often circumvented the payment system by performing work on the automobile prior to the claim being called in. However, because of the previous Fax Dispatches sent for other claims, and the transmission of the Blast Faxes, Alpine clearly knew Farmers' pricing terms before doing work for the insured.

18. After performing work for Farmers and its insured, Alpine would bill Farmers directly. Farmers then paid Alpine pursuant to the Blast Fax pricing offers, and the reconfirmation of pricing in the Fax Dispatches. Farmers did not pay the amount of the Alpine bill that exceeded Farmers' pricing terms, but paid the amounts set out in the pricing offers. Alpine accepted these amounts by negotiating the payment drafts.

19. Windshield glass replacement falls under "PART IV - DAMAGE TO YOUR CAR" of the Farmers' policy. Attached as Exhibit A is a true and correct copy of

the standard Minnesota auto policy issued to Farmers' policyholders during all times relevant to this litigation. The general Limits of Liability portion of that coverage provides that Farmers' liability would not exceed "[t]he amount which it would cost to repair or replace the damaged or stolen property with other of like kind and quality . . . ." However, Farmers' obligation to pay for the glass replacement was modified by specific endorsement language in the insurance policies.

20. Since April 2000, Farmers has issued to new and renewing Minnesota customers the MN008 endorsement. This endorsement (specifically, the third edition) applies to all policies at issue in this case. Attached as Exhibit B is a true and correct copy of the standard Minnesota MN008 Endorsement (3rd Ed.) issued to Farmers' policyholders during all times relevant to this litigation. The MN008 (3rd Ed.) tracks the language of the UCPA glass pricing provisions:

> For glass losses, the maximum amount that we will pay for repair or replacement is the prevailing competitive price. The competitive price includes the cost of repair or replacement including labor rates, parts and material. You may choose your own repair facility or upon your request, we will identify the facilities that will perform the repairs for the prevailing competitive price.

21. The above language follows the UCPA requirement that the insurer pay "the insured's chosen vendor based on a competitive price that is fair and reasonable within the local industry at large." Minn. Stat. § 72A.201, subd. 6(14) (2002). As a mandatory endorsement, the MN008 Endorsement applies to all insureds' claims involved in this case.

22. For many years, Farmers also offered its insured an optional deductible waiver endorsement, E1400, titled "Safety Glass—Waiver of Deductible Coverage F." Attached as Exhibit C is a true and correct copy of the standard Minnesota E1400 Endorsement (1st Ed.) issued to Farmers' policyholders between October 1988 and March 2004. The E1400 Endorsement (1st Ed.) provides, in pertinent part:

> For an additional premium, it is agreed that any deductible applying to Coverage F – Comprehensive does not apply to safety glass.
>
> Our limit of liability for loss is the amount necessary to repair or replace safety glass.

23. From March 2004 on, Farmers issued the second edition E1400 Endorsement that contains identical language to the first edition except that the words "repair or" are removed from the liability limit section. Attached as Exhibit D is a true and correct copy of the standard Minnesota E1400 Endorsement (2nd Ed.).

24. The first and second editions of the E1400 Endorsements apply to most of the claims involved in this case. The E1400 eliminates the deductible for glass claims, but does not specifically amend the general comprehensive limits of liability, nor does it provide for how auto glass repair or replacement payments are to be determined.

25. As a general matter, this case does not involve typical consumer transactions where customers select the seller based on, among other things, the price of the good or service provided by the seller. The consumer here (the insured) does not have to pay directly for the auto glass goods or services she needs; those are paid for entirely by Farmers, except, in some rare cases, where the insured has not paid for the deductible to be waived. In a very small percentage of instances involved in this lawsuit,

the Farmers policyholder elected not to purchase the deductible waiver endorsement from Farmers. Farmers did not have the freedom to pick and choose the auto glass vendor based on the vendor's charge. It is my understanding that Minnesota law requires that the insurer use the glass vendor chosen by the insured, and pay that vendor directly, not the insured.

26. Farmers provides the non-affiliate glass vendors notice of exactly what Farmers will pay pursuant to its insurance policies and the law. This way, Farmers makes an offer of its prices to the glass vendor before work is performed instead of withholding the portion of the invoice that is over-billed after the work is done. With full knowledge of what Farmers will pay, the glass vendor has the opportunity to decline the work if it does not like the pricing terms. If the glass shop declines the work, this allows the policyholder to choose another glass shop, or, if she has no further preference, to request a recommendation from Safelite for an available affiliate or non-affiliate shop in the policyholder's area. Farmers does not have the freedom to reject a vendor chosen by its policyholder because of the vendor's price. That vendor, however, has the freedom to reject a job for a Farmers' policyholder because of Farmers' price.

27. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: 2/12/07

s/ Michael Keller
Michael Keller