IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

ALPINE GLASS, INC.,

Plaintiff/Counterclaim Defendant,

vs.

ILLINOIS FARMERS INSURANCE COMPANY AND MID-CENTURY INSURANCE COMPANY,

Defendants/Counterclaim Plaintiffs.

Court File No. 0:06-CV-01148 PJS-RLE

**DECLARATION OF MARK ANNIS**

I, Mark Annis, declare as follows:

1. I am the Manager of Inventory Control and Sales Audit, formerly the Assistant Controller of Network Operations at Safelite Solutions, LLC, a Delaware limited liability company ("Safelite"). As Assistant Controller, I was responsible for assisting in the billing, invoicing and auditing for the glass shops and insurance companies using our services for administering auto glass claims. Safelite currently does business with approximately 59,000 total glass shops (network and non-network) in the United States. Safelite contracts with Illinois Farmers and Mid-Century Insurance ("Farmers") to operate as the glass claim third party administrator for Farmers in the United States, including Minnesota. I have personal knowledge of the facts alleged in this Affidavit through my experience in working in this capacity.

2. Around 1995, Farmers hired Safelite to administer Farmers' automobile glass repair and replacement claims. Safelite is a third party administrator that assists Farmers in the process of handling glass claims through the maintenance of a network of affiliate glass shops, and the processing and payment of invoices from auto glass shops.

3. Alpine has never contracted with Safelite or Farmers to be an affiliate provider glass shop for Farmers, but Safelite frequently deals with Alpine when a Farmers insured specifically requests Alpine.

4. Safelite provides nationwide coverage for auto glass claims, ensuring that Farmers' policyholders in any location across the United States can obtain readily available auto glass replacement services. Safelite maintains a network of affiliate glass shops that have contracted with Safelite to do repair and replacement work for Safelite's insurance company clients at set prices.

5. Safelite does not work solely with Safelite affiliate auto glass vendors. For example, when processing Farmers' claims, Safelite often dispatches work to non-affiliate vendors like Alpine when the Farmers insured requests the non-affiliate shop. On behalf of Farmers, Safelite respects the insured's choice of glass shop, and pays the chosen glass shop directly. To this end, Farmers provides Safelite with telephone scripts for its customer service representatives (CSR) that explain to the Farmers' insureds that Farmers respects any choice of glass shop. When a Farmers' policyholder from Minnesota calls, the Safelite CSR explains: "Minnesota law gives you the right to go to any glass vendor you choose, and prohibits me from pressuring you to choose a particular vendor."

6. The amounts Farmers intended to pay (and did pay) according to its insurance policies and Minnesota law were sent to various glass shops in Minnesota and elsewhere in faxed pricing bulletins ("Blast Fax(es)") whenever Farmers made changes to its pricing from June 2002 on. On behalf of Farmers, Safelite handled the actual

communication of the Blast Faxes. Farmers gave full authorization to Safelite to send the Blast Faxes to glass shops, and approved their contents. True and correct copies of the form Blast Faxes sent to Alpine are attached as Exhibits A (2002) and B (2005).

7. All known open Minnesota Alpine stores were included as recipients of the Blast Fax pricing bulletins, whether sent to Alpine's corporate office or directly to the store.

8. The Blast Faxes listed the "pricing standards" that Farmers would pay for the following parts and labor: Windshield Discount (in terms of a discount off of or above National Auto Glass Specifications ("NAGS") benchmark pricing); Tempered Discount (in terms of a discount off of or above NAGS); Labor; High Modulus/Non-Conductive Urethane; All other Urethane; and Repairs.

9. The Blast Faxes stated, "Please continue to submit your invoices in accordance with the billing instructions on the fax/dispatch that you receive for each Farmers transaction. Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted." The Blast Faxes also stated, "We look forward to working with you in providing glass service to Farmers Insurance customers."

10. Beginning in February of 2005, the Blast Faxes included the following language (as seen in Exhibit B):

> Our policyholders have the right of personal choice and preference in their selection of an automotive glass shop. However, because we are obligated, on behalf of all of our policyholders, to pay only the fair market value for glass repairs and replacement services, you may consider refusing the job if you are unwilling to provide service at the prices Farmers Insurance has offered above. Nothing contained in any oral or written notice received by us or our agent from you purporting to reject such pricing for services you

> may render for any of our insureds will be binding on us or otherwise require us to pay you additional sums for services rendered.
>
> If you desire to bill for more than Farmers Insurance's fair and reasonable pricing as stated above, you must advise our policyholders prior to initiating glass repair/replacement so that they can determine whether they are willing to pay the additional costs for your services.

11. The Blast Faxes stated on their face that the prices listed within were to supersede any prior pricing agreements the glass shop had with Farmers.

12. Safelite sent a Blast Fax to every known open Minnesota Alpine glass shop or to Alpine's main corporate office whenever prices in Minnesota changed. During the relevant timeframe of this litigation, Farmers' prices changed in February 2005. On behalf of Farmers, Safelite sent Alpine Blast Faxes in June 2002, and February 2005, outlining Farmers' price offers.

13. It is my understanding that Safelite customer service representatives confirmed by telephone Farmers' pricing terms with an Alpine representative, if available. Typically, these telephone conferences were initiated by the insured, or both the insured and an Alpine representative. During this call the Safelite CSR would tell the policyholder and the Alpine representative the prices that had been offered by Farmers in the Farmers Blast Fax. The telephone calls were recorded by Safelite and available to Farmers for compliance purposes.

14. Alpine representatives were not available for every call, but, in those cases, Alpine still would have received the confirmations of the pricing offers through subsequent facsimile dispatches, also known as fax dispatches or work orders. Claims

were not called in to Farmers through Safelite in every case, and, in many cases, Alpine submitted a claim after work had been performed.

15. Safelite reconfirmed Farmers' pricing terms by transmitting a faxed dispatch/work order document to Alpine with Farmers' itemized pricing for the specific claim ("Fax Dispatch"). True and correct copies of examples of Fax Dispatches sent to Alpine are attached as Exhibit C. The Fax Dispatch prices for the specific claims derived from the Blast Fax prices and did not deviate from those prices. Farmers gave full authorization to Safelite to send the Fax Dispatches to glass shops, and Farmers approved their contents.

16. Starting in 2003, and continuing to the present, every Fax Dispatch that went to Alpine included a confirmation of the pricing terms and, below that pricing notice, stated: "Performance of services constitutes acceptance of the above price." This language was spelled out in capital letters in 2003, and lowercase letters (to save space in the document) from 2004 through 2007.

17. Farmers' glass claim payment system was set up so that when the insured called in a claim, the Fax Dispatch was sent to the glass shop prior to the work ever starting. Unfortunately, Alpine often circumvented the payment system by performing work on the automobile prior to the claim being called in. However, because of the previous Fax Dispatches sent for other claims, and the transmission of the Blast Faxes, Alpine clearly knew Farmers' pricing terms before doing work for the insured.

18. After performing work for Farmers and its insured, Alpine would bill Farmers directly (usually through Safelite). Farmers, through Safelite, then paid Alpine

pursuant to the Blast Fax pricing offers, and the reconfirmation of pricing in the Fax Dispatches.

19. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: February 12, 2007

s/ Mark Annis
Mark Annis