UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Alpine Glass, Inc.,

Plaintiff,

v.

Illinois Farmers Insurance Company
And Mid-Century Insurance Company,

Defendants.

Civil No. 06-01148 PJS/RLE

**AFFIDAVIT OF MICHAEL REID**

STATE OF WASHINGTON )
) ss
COUNTY OF KING )

After swearing to tell the truth, Michael Reid states as follows:

1. I am the President of Alpine Glass, Inc., a position I have held for more than 10 years. I make this affidavit in support of Plaintiffs' motion to consolidate invoices for purposes of arbitration.

2. Because of my experience and position at Alpine Glass, I am familiar with the automobile glass industry generally as well as Alpine's interactions with insurers generally and Farmers Insurance Company specifically.

3. Alpine is a Minnesota corporation with its principal place of business in Minnesota. Alpine is, and during the time in question was, engaged in the business of automobile glass repair and replacement in Minnesota.

4. Because of the nature of Alpine's business, one of my duties is to deal with insurance companies. A significant portion of the work we perform is paid for by

our customers' insurance companies. It is our custom and practice that when we complete the work for our insured customers, they assign to us all the insurance proceeds that are owed to them by their insurer. This is how our insured customers pay us for the work we perform. We then submit an invoice to the insurer, like Farmers, who pays us directly for the claim. In every instance at issue here, the payment was made directly to Alpine in conformance with the assignments. None of the payments were made to our customers.

5. Automobile glass pricing, and the interaction between glass companies like Alpine and insurers like defendant here, is a fairly simple proposition. There are basically four components that typically make up the final price for an installed piece of automobile glass: glass, adhesive (often referred to in our industry as a "kit"), labor and, depending on the vehicle, additional parts such as moldings, clips, etc. Side glass or door glass is slightly different because it usually contains only glass and labor.

6. Because there are more than 10,000 separate auto glass parts, pricing between insurers and glass companies is not discussed on a part by part basis which would be far too cumbersome and time-consuming. Consequently, both the glass and insurance industries use the publication of a reference price list referred to as NAGS (National Auto Glass Specifications). NAGS is widely circulated in the glass and insurance industries and provides a benchmark price by part and number for each auto glass part. As an example, attached as Exhibit A to this affidavit is a copy of one page of an old, January 1999, NAGS price list. The list shows the

part number, color code, price, and labor hours for installing that particular part. It also contains certain codes for the part.

7. Pricing of glass is then discussed as a factor of the NAGS benchmark, individually by part. For example, a glass company's price for glass would be discussed as a function of the NAGS such as "list plus 40%", "list", "10% off list" or something similar. The dollar amounts charged change depending on the particular piece of glass being replaced based on the NAGS list price but the glass company's "pricing," the percent of the list price, remains the same, subject to periodic adjustment.

8. Insurance companies such as defendant also speak of pricing as a factor of NAGS. Farmers made their payments based on a factor of the NAGS benchmark and, just as was true for glass company charges, the dollar amount of insurance company payments may change from part to part, but the factor of the NAGS list that the insurance company is willing to pay remains the same; also subject to periodic adjustment.

9. Labor rates are also consistent from job to job. Labor is typically charged one of two ways: either a flat installation rate (for example, $100); or on an hourly basis using the published installation times included in NAGS.

10. It is my understanding that published labor times is the standard in the automotive service industry from mechanical repairs to body shop/collision repairs. With minor exceptions, the installation times published by NAGS are consistent with the Mitchell Collision Estimating Guide, a publication widely used by body shops.

Attached as Exhibit B is an explanation from the January 1999 NAGS that discusses the published labor times issue.

11. As was true for glass, how Alpine charged the defendants for labor remained consistent from job to job, subject to periodic adjustment.

12. Adhesive or kit prices are also consistent from job to job. The dollar amount may vary depending on the amount of adhesive required to complete an installation. Alpine typically charges a flat rate for adhesive per tube per NAGS (NAGS also sets forth the amount of adhesive required for each part). Insurers, correspondingly, typically pay a set amount for adhesive. Again, to the extent the dollar amounts change from claim to claim, it is because of the amount of adhesive has changed.

13. The final component, moldings, clips, etc. is typically not an issue. Alpine charged dealer list price for such items and most insurers, including Farmers, pay that amount for those miscellaneous parts. As a result, this is not really part of the dispute.

14. This approach is consistent with how Alpine and Farmers interacted over the time period in question. Alpine's billings are based on factors of the NAGS list and added to that glass price are charges for labor and adhesive. Those charges are consistent from invoice to invoice. For example, a 2007 BMW is priced the same as a 1995 Corolla because the factor of NAGS remains the same, the labor rate remains the same and the kit price remains the same. Similarly, defendant's payments are based on what they will pay for glass (which is calculated as a factor of the NAGS list), labor and adhesive, also subject to periodic adjustment. Indeed,

Farmers or its third-party administrator sent letters to Alpine from time to time setting forth its formula for glass claims.

15. During the relevant time periods of this dispute, Alpine charged Farmers one price level for glass. Specifically, Alpine generally charged list price minus 15% for every piece of glass. Alpine also charged Farmers the same hourly labor rate for each invoice. Alpine charged $65.00 per published NAGS hour on each invoice.

16. Over the years, I have been involved in disputes with other insurers over reimbursements of Alpine's invoices. The disputes over those invoices all have common factual elements and common legal issues. It has been my experience that it is not difficult at all to address the disputes over those invoices in a consolidated manner. In contrast, to address the invoices in an individual way would result in a needless repetition of witnesses, evidence and argument.

17. Attached as Exhibit C to this affidavit is a spreadsheet summarizing the individual claims Alpine is asking the Court to consolidate. The summaries identify the invoice number, the invoice date, the customer and other information such as the amount that was billed, the amount that Farmers paid and the amount that remains owing.

Michael Reid

Subscribed and sworn to before me
this 12 day of February 2007.

Notary Public

MISTY D. GRAY
NOTARY PUBLIC
COMMISSION EXPIRES 12-29-08
STATE OF WASHINGTON